# United States Court of Appeals

## For the First Circuit

No. 06-2038

WESLEY SPRATT,

Plaintiff, Appellant,

v.

RHODE ISLAND DEPARTMENT OF CORRECTIONS;
A.T. WALL, Director, Rhode Island Department of Corrections,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Lynette Labinger, with whom Roney & Labinger LLP Cooperating
Counsel, Rhode Island Affiliate, American Civil Liberties Union,
was on brief, for appellant.
Patricia A. Coyne-Faque, Chief Legal Counsel, Rhode Island
Department of Corrections, was on brief, for appellee.

April 6, 2007

**TORRUELLA, Circuit Judge**. Wesley Spratt ("Spratt") is a prisoner in the Adult Correctional Institution ("ACI") in Rhode Island. After prison officials prohibited Spratt from preaching to his fellow inmates, he filed suit against the Rhode Island Department of Corrections and its director, A.T. Wall (collectively, "RIDOC") under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. ("RLUIPA"). The district court granted summary judgment to RIDOC. After careful consideration, we reverse and remand for further proceedings.

## I. Background

Spratt is a prisoner in the maximum security unit and is serving a life sentence for murder. See State v. Spratt, 742 A.2d 1194 (R.I. 1999). In 1995, Spratt underwent a religious awakening, and began attending Christian services at the ACI. Impressed with his commitment and devotion, the prison chaplains began allowing Spratt to preach[1] to inmates during weekly services. In 2000, Spratt was ordained as a minister by the Universal Life Church. From 1995 until 2003, no prison official interfered with Spratt's religious activities.[2] Spratt's preaching during this seven year

---

[1] To be clear, we use the word "preach" to refer to the activity of commenting or expounding upon some religious text. RIDOC continues to allow Spratt to read scripture aloud during religious services so long as he does not add any commentary.

[2] RIDOC suggests that the then-warden of the prison, Warden Whitman, may not have been aware of Spratt's preaching. However,

-2-

period did not lead to any apparent disciplinary problems at the ACI.

In 2003, then-Warden Whitman was replaced by Warden Weeden, who remains the warden of the ACI. On October 15, 2003, Spratt was told by a correctional officer that he was no longer allowed to preach in the chapel. When Spratt approached Warden Weeden about the matter, he was told that preaching by prisoners was not allowed under prison regulations. Spratt formalized his complaint in writing, and Warden Weeden responded that inmate preaching was prohibited by RIDOC Policy # 26.01-2DOC, which states that all religious services are scheduled, supervised, and directed by institutional chaplains.[3] Weeden also informed Spratt that if he was found to be preaching, he would be subject to disciplinary action. Spratt then filed a complaint with A.T. Wall, director of RIDOC, stating the aforementioned facts, and asking that Wall allow him to preach. Wall responded in a letter dated December 15, 2003, which states:

_____

Spratt stated in an affidavit, uncontroverted by RIDOC, that his preaching was openly known to other prison officials, and that he proudly spoke about his preaching activities during his yearly classification reviews.

[3] This policy, however, does not address the issue of whether inmates may participate in religious services under the supervision of approved clergy, as was the case with Spratt. We defer to RIDOC's interpretation of this policy to prohibit an inmate from expounding upon the scripture, but not to prohibit an inmate from reading religious texts without commentary.

-3-

> Mr. Spratt, you do have the right to practice your religion under the constitution subject to reasonable restrictions. Because you are not an acknowledged member of the clergy, you do not have the right to proselytize or preach to the inmate population. Therefore, your request for my intervention is denied.

Spratt proceeded to file a pro se complaint against Wall and RIDOC in the United States District Court for the District of Rhode Island, asking for relief under the First Amendment, the Fourteenth Amendment, and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(C) ("RFRA").[4] Spratt's complaint stated that the prison policy prohibiting inmate preaching did not satisfy the "least restrictive means" test in RFRA, and asked for declaratory relief, injunctive relief, and damages of $40.29 (the cost of legal paper and copies). RIDOC filed an answer stating that they lacked sufficient information to admit or deny Spratt's allegations, but asserted various affirmative defenses. Spratt moved for summary judgment, attaching various letters from prison clergy attesting to his skill as a preacher, his minister's certificate, and the aforementioned correspondence between himself and prison officials. RIDOC responded with a cross-motion for summary judgment, asking that the claims against Wall in his individual capacity be

---

[4] Spratt initially filed suit under RFRA. However, RFRA was found to be unconstitutional as applied to purely state (as opposed to federal) action in City of Boerne v. Flores, 521 U.S. 507 (1997). In its response to Spratt's complaint, RIDOC noted that Spratt would likely refile his complaint under RLUIPA. Since then, the district court and the parties have treated Spratt's complaint as arising out of RLUIPA. We do not disturb this decision.

dismissed,[5] and arguing that RIDOC had satisfied the requirements of RLUIPA because (a) Spratt's religious exercise was not substantially burdened and (b) even if it was burdened, RIDOC had a compelling state interest which was accomplished by the least restrictive means. RIDOC attached to their motion for summary judgment a "statement of undisputed facts," which acknowledged that "no material facts are in dispute in this matter."

The case was referred to a magistrate judge, who filed a report and recommendation granting RIDOC summary judgment on Spratt's First and Fourteenth Amendment claims,[6] and staying the RLUIPA claim pending the Supreme Court's resolution of <u>Cutter</u> v. <u>Wilkinson</u>, 544 U.S. 709, 722-24 (2005), which considered various constitutional challenges to RLUIPA.

After <u>Cutter</u> rejected the constitutional challenges to RLUIPA, the magistrate judge ordered the parties to submit additional briefing as to whether RLUIPA was applicable to RIDOC, and as to the merits of Spratt's RLUIPA claim. RIDOC submitted a supplemental memorandum acknowledging that it was subject to RLUIPA because it accepted federal funding, and attached an affidavit from Jake Gadsden, Assistant Director of Operations for the Rhode Island

---

[5] This argument was never addressed by the district court, and we express no opinion as to its merit.

[6] Spratt filed an interlocutory appeal of this judgment, which we denied on April 4, 2006. <u>Spratt</u> v. <u>Walls</u>, No. 05-1583 (1st Cir. Apr. 4, 2006). Spratt does not appeal the grant of summary judgment on these claims.

Department of Corrections. The affidavit briefly reviews Gadsden's professional experience, and states that inmates may not lead religious services in RIDOC facilities. Gadsden explains in the affidavit that inmate preaching could be dangerous because "placing an inmate in a position of actual or perceived leadership before an inmate group threatens security, as it provides the perceived inmate leader with influence within the administration." Gadsden further states in the affidavit that "there is no less restrictive manner to accommodate Spratt's desire to preach to an inmate congregation, other than an outright ban," because even an inmate preaching under RIDOC supervision would be perceived as having influence. Finally, the affidavit states that Gadsden was familiar with a program in the Texas Correctional System which he identified as the "trustee" program, in which inmates were given certain leadership roles. Gadsden states that Texas abolished the program because the inmate leaders abused their positions to garner favors from fellow inmates.

Spratt filed an affidavit in response, which states that he acknowledges Gadsden's "noteworthy" credentials, but that Gadsden's conclusions are "exaggerat[ion] and speculation." Spratt also stated in a memorandum of law that he would willingly submit to further RIDOC supervision of his preaching activities. He also suggested that RIDOC could retain their policy against inmate preaching but grant limited exemptions when enforcement of the

policy would result in a violation of RLUIPA.  Spratt noted that RIDOC allows inmates to congregate and talk freely about non-religious topics during recreational time, and that this had not been found to pose a threat to prison security.

The magistrate judge issued a report and recommendation granting RIDOC summary judgment on Spratt's RLUIPA claim.  The report found that Spratt had satisfied the first two elements of the RLUIPA test: that preaching was part of Spratt's religious exercise and that the religious exercise had been substantially burdened by the RIDOC prohibition.  However, the magistrate judge concluded that RIDOC had established that inmate security was a compelling state interest, and that the total ban on inmate preaching was the least restrictive means by which to accomplish that goal.

Spratt objected to the magistrate judge's report and recommendation, and the issue was referred to a district judge. The court held a hearing on the objection on April 6, 2006. At the hearing on Spratt's objection, Spratt was represented by counsel from the ACLU of Rhode Island.  During the hearing, the court initially seemed skeptical of RIDOC's claim that the Gadsden affidavit was sufficient to overcome summary judgment, stating, "What evidence do I have?  See, that's the problem here.  What evidence is in the record that says it's got to be a total ban. There's just no other solution.  I'm looking at this very high

burden and very little evidence." Nevertheless, the court adopted and affirmed the magistrate judge's report and recommendation, noting that "while the issue is somewhat of a close call, the Magistrate Judge's [report and recommendation] on balance represents both a fair and reasonable interpretation of the RLUIPA claim."

## II. __Analysis__

### A. Standard of Review

We review a grant of summary judgment de novo, viewing the record in the light most favorable to the non-moving party. Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006). Summary judgment is appropriate only if there are no material disputes of fact, and if the moving party is entitled to judgment as a matter of law. Id.

### B. RLUIPA

RLUIPA was enacted in 2000 as a response to the Supreme Court's decision in City of Boerne v. Flores, which partially struck down the previously enacted Religious Freedom Restoration Act on the grounds that it exceeded Congress' power to regulate the states under the Fourteenth Amendment. 521 U.S. 507, 529-36 (1997) (holding that RFRA may not be applied to purely state, as opposed to federal, action). Whereas RFRA had applied to all action by "Government," RLUIPA is substantially narrower in scope, and the portion of that statute at issue in this case applies only to "a

program or activity [in an institution] that receives Federal financial assistance." 42 U.S.C. § 2000cc-1(b)(1). Substantively, RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in [42 U.S.C. § 1997], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
>> (1) is in furtherance of a compelling governmental interest; and
>> (2) is the least restrictive means of furthering that compelling governmental interest.

Id. § 2000cc-1(a). Thus, a claim under RLUIPA includes four elements. On the first two elements, (1) that an institutionalized person's religious exercise has been burdened and (2) that the burden is substantial, the plaintiff bears the burden of proof. Id. § 2000cc-2(b). Once a plaintiff has established that his religious exercise has been substantially burdened, the onus shifts to the government to show (3) that the burden furthers a compelling governmental interest and (4) that the burden is the least restrictive means of achieving that compelling interest. Id.

### 1. Spratt's Burden

For purposes of this appeal, the state does not seriously dispute that Spratt's evidence on his prima facie case is sufficient to survive summary judgment. As an inmate in a state correctional facility, Spratt is an institutionalized person within

the definition of RLUIPA. See id. § 1997(1) ("The term 'institution' means any facility or institution--(A) which is owned, operated, or managed by, or provides services on behalf of any State or political subdivision of a State; and (B) which is--(ii) a jail, prison, or other correctional facility . . . ."). Furthermore, it is clear that preaching is a form of religious exercise. See McDaniel v. Paty, 435 U.S. 618, 626 (1978) ("[T]he right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions.").

As to the second prong, RIDOC devotes a footnote in its brief to suggesting that Spratt's "exercise of . . . religion in general is not being substantially burdened." Appellees' Br. at 11 n.6. RIDOC points out that "Spratt may still attend and participate in religious services. He may pray, sing, or recite during such services just as every other inmate may." Id. We have not yet had the opportunity to define what constitutes a "substantial burden" under RLUIPA. The district court decided that a "substantial burden" is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," citing Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 718 (1981); see also Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (applying the Thomas standard in a RLUIPA case). Assuming arguendo that Thomas applies, RIDOC has not

-10-

on this appeal seriously contested the issue and Spratt has stated that RIDOC will not allow him to preach anytime or anywhere, threatening that if he does so, he will be subject to disciplinary sanctions. As such, for the purposes of this appeal, Spratt has made a prima facie showing that his religious exercise has been substantially burdened.

## 2. RIDOC's Burden

The burden thus shifts to RIDOC to demonstrate that its ban on inmate preaching, as applied to Spratt, furthers a "compelling governmental interest" and is the least restrictive means of achieving that interest. 42 U.S.C. § 2000cc-1. We are mindful, however, that in passing RLUIPA, Congress stated that we should continue to give "due deference to the experience and expertise of prison and jail administrators" in determining prison policy. Cutter, 544 U.S. at 717 (internal quotation marks omitted)(quoting 146 Cong. Rec. S7774, S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA)). However, as the Congressional sponsors of RLUIPA stated, "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements." 146 Cong. Rec. at S7775 (internal quotation marks omitted).

RIDOC asserts that it has a compelling state interest in maintaining prison security. We agree. See, e.g., Cutter, 544

U.S. at 725 n.13 ("It bears repetition . . . that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area."). However, merely stating a compelling interest does not fully satisfy RIDOC's burden on this element of RLUIPA; RIDOC must also establish that prison security is furthered by barring Wesley Spratt from engaging in any preaching at any time.

RIDOC has offered just one piece of evidence to support this assertion: the Gadsden affidavit.[7] This affidavit, which cites no studies and discusses no research in support of its position, simply describes the equation thus: if Spratt is a preacher, he is a leader; having leaders in prison (even those sanctioned by the administration) is detrimental to prison security; thus, Spratt's preaching activity is detrimental to prison security. But to prevail on summary judgment, RIDOC "must do more than merely assert a security concern." Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 988 (8th Cir. 2004). The Gadsden affidavit offers only one reference to another prison in support of its assertion that inmate preaching is a security concern: the

---

[7] Spratt also objects that the Gadsden affidavit does not satisfy the requirement that an expert affidavit "include the factual basis and the process of reasoning which makes the conclusion viable." Hayes v. Douglas Dynamics, 8 F.3d 88, 92 (1st Cir. 1993). Because we find that the affidavit does not provide sufficient evidence to sustain RIDOC's burden under RLUIPA, we need not address this issue now. However, we suggest that on remand, the district court determine whether the Gadsden affidavit satisfies the requirements for the admissibility of an expert affidavit.

-12-

affidavit mentions a situation in Texas which was described as a "trustee" system. We believe that Gadsden was referring to the "building tender" system present in Texas prisons in the 1970s. This situation, of course, is radically different: building tenders were inmates who were armed, served as official guards within the prison, and who were serving in supervisory capacities in the prison system. See generally Ruiz v. Estelle, 503 F. Supp. 1265, 1294-98 (S.D. Tex. 1980). Whereas it is quite easy to see how armed prisoners granted nearly indiscriminate authority to brutalize fellow prisoners are a threat to institutional security, the same cannot be said about a preacher who offers a weekly sermon under the direction of the prison chaplain.

Beyond the Texas "trustee system," Gadsden cites no past instances where having inmates in leadership positions endangered security, nor does he explain why a person who expounds on the scripture during a weekly religious service would be considered a leader. Self-serving affidavits that do not "contain adequate specific factual information based on personal knowledge" are insufficient to defeat a motion for summary judgment, let alone to sustain one. Quiñones v. Houser Buick, 436 F.3d 284, 290 (1st Cir. 2006); see also Hayes, 8 F.3d at 92 ("Although an expert affidavit need not include details about all of the raw data used to produce a conclusion, or about scientific or other specialized input which might be confusing to a lay person, it must at least include the

-13-

factual basis and the process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment.").

In addition, RIDOC's initial explanation for the preaching ban was that only ordained ministers were allowed to preach, and that Spratt was not ordained. However, according to materials submitted in connection with Spratt's motion for summary judgment, he had been an ordained minister since 2000.[8] RIDOC now claims that its initial explanation was "incomplete," and that the real reason is that no inmates are allowed to preach at all. At the very least, the inconsistencies between RIDOC's various explanations for its policy require further explanation.[9]

---

[8] Spratt claims that in fact, the ban on preaching was enacted in retribution for a dispute that he had with a guard. If this were true, it would undercut the state's argument that the blanket ban on preaching is essential to prison security.

[9] RIDOC offers a third explanation for its prohibition on inmate preaching. RIDOC suggests that inmate-led religious activities could foment terrorism-related activity. See Appellee's Br. at 18 n.8 (citing Frank Cilluffo et al., Geo. Wash. Univ. Homeland Sec. Policy Inst. and Univ. of Va. Critical Incident Analysis Group, Out of the Shadows: Getting Ahead of Prisoner Radicalization (2006), available at http://www.gwumc.edu/hspi/reports/rad/Out%20of%20the%20shadows.pdf). The report cited by RIDOC describes the formation of terror cells in prisons by radicalized Muslim inmates. This explanation for the blanket ban on inmate preaching further demonstrates that RIDOC has not engaged in any individualized consideration of Spratt's preaching whatsoever. Cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 126 S. Ct. 1211, 1221 (2006) (requiring that the government engage in individualized consideration of the necessity of a burden on religious exercise).

Finally, RIDOC claims that it was merely "lucky" that institutional security was not threatened during Spratt's seven year stint as a preacher, and that it need not wait for a dangerous situation to occur before it takes steps to remedy the threat. See Casey v. Lewis, 4 F.3d 1516, 1521 (9th Cir. 1993) (noting that "failure to specify a past event" that threatened institutional security "does not render irrational the adoption and implementation of a . . . policy" to address future events that might pose a threat). RIDOC also claims that its policy is long-standing, and that prison officials who permitted Spratt to preach were in violation of it. However, Spratt's seven-year track record as a preacher, which is apparently unblemished by any hint of unsavory activity, at the very least casts doubt on the strength of the link between his activities and institutional security. While we recognize that prison officials are to be accorded substantial deference in the way they run their prisons, this does not mean that we will "rubber stamp or mechanically accept the judgments of prison administrators." Lovelace, 472 F.3d at 190.[10]

Even if we assume that RIDOC has shown a link between Spratt's preaching and institutional security, RIDOC still has not

[10] In Lovelace, the Fourth Circuit suggested that its result would have been different if "assumptions about the governmental interests involved here had been included in an affidavit by the warden or some other [prison] official." 472 F.3d at 191. We do not think that an affidavit that contains only conclusory statements about the need to protect inmate security is sufficient to meet RIDOC's burden under RLIUPA.

shown that the blanket ban on all inmate preaching is the "least restrictive means" available to achieve its interest. A prison "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." Warsoldier v. Woodford, 418 F.3d 989, 999 (9th Cir. 2005); Murphy, 372 F.3d at 989 ("It is not clear that MDOC seriously considered any other alternatives, nor were any explored before the district court."); cf. Casey v. City of Newport, 308 F.3d 106, 114 (1st Cir. 2002) ("[T]he narrow-tailoring test requires the district court to consider whether the regulation challenged on First Amendment grounds sweeps more broadly than necessary to promote the government's interest. That consideration, in turn, cannot be done without some evaluation of the alternative measures put in issue by the parties.").[11] Rather than considering alternatives, RIDOC argues that inmate preaching is an "all or nothing" issue: any amount of inmate preaching, it contends, is dangerous to institutional security under any circumstances. As

---

[11] It is important to note that we do not construe RLUIPA to "require prison administrators to refute every conceivable option in order to satisfy the least restrictive means prong of RFRA." Hamilton v. Schriro, 74 F.3d 1545, 1556 (8th Cir. 1996). However, to meet the least restrictive means test, prison administrators generally ought to explore at least some alternatives, and their rejection should generally be accompanied by some measure of explanation. A blanket statement that all alternatives have been considered and rejected, such as the one here, will ordinarily be insufficient.

-16-

such, RIDOC argues, there are no "less restrictive alternatives." However, it is not clear how RIDOC has come to this conclusion. See Warsoldier, 418 F.3d at 999 (explaining that a California prison had done "nothing to . . . discuss whether it has ever considered a less restrictive approach" to a blanket ban on long hair). RIDOC offers no explanation for why alternative policies would be unfeasible, or why they would be less effective in maintaining institutional security.

RIDOC responds by pointing to the Eighth Circuit's decision in Hamilton v. Schriro, 74 F.3d 1545 (8th Cir. 1996), in which that court accepted prison administrators' contention that a regulation requiring inmates to have short hair was the least restrictive means of achieving prison security. However, the court in Hamilton made this determination after considering lengthy testimony by the prison administrators in the district court, something which is notably absent here. Id. at 1555. In addition, the Eighth Circuit relied on several district court decisions upholding hair length regulations against RFRA challenges, at least one of which appears to have considered and rejected alternatives to the regulation. Id. at 1555 n.12. In contrast, RIDOC offers no case finding that blanket bans on inmate preaching satisfy the least restrictive means test, and none appear to exist.[12] Finally,

_____

[12] Past decisions have found that restricting inmate preaching "reasonably" furthered institutional security. See, e.g., Anderson v. Angelone, 123 F.3d 1197, 1199 (9th Cir. 1997) ("Requiring an

-17-

the Eighth Circuit explicitly acknowledged that "prison authorities must do more than offer conclusory statements and post hoc rationalizations for their conduct." Id. at 1554 n.10. Thus, Hamilton lends little support to RIDOC's argument here.

In fact, RIDOC's "all or nothing" argument raises many questions. Why are inmates banned from preaching when they are free to become leaders under other circumstances? Likewise, why is Spratt still allowed to stand in front of his congregation and read scripture if it is his appearance in the pulpit that is problematic? If it is the "teaching" element of scripture that is so troubling, why are inmates permitted to assist instructors in educational programs at the prison? Why would allowing preaching only under strict prison supervision be a less effective solution to the purported "threat to institutional security"? These questions, all unanswered, suggest that RIDOC has not given consideration to possible alternatives.[13]

_____

outside minister to lead religious activity among inmates undoubtedly contributes to prison security."); Hadi v. Horn, 830 F.2d 779, 785 n.9 (7th Cir. 1987). However, these cases were decided under the pre-RLUIPA standard of Turner v. Safley, which states that a "[prison] regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). The RLUIPA standard, which requires that prison administrators achieve a "compelling interest" by the "least restrictive means," imposes a different burden on prison officials. See Lovelace, 472 F.3d at 199-200 ("[T]he First Amendment affords less protection to inmates' free exercise rights than does RLUIPA.").

[13] This list of questions is offered by way of example, and is not exhaustive. We leave it to the district court to determine whether

Furthermore, "[e]qually problematic . . . is that other prison systems, including the Federal Bureau of Prisons, do not have such . . . policies or, if they do, [they] provide . . . exemptions." Warsoldier, 418 F.3d at 999. As Spratt points out, the Federal Bureau of Prisons policy on religious practices appears to contemplate inmate-led religious services in certain circumstances. See Federal Bureau of Prisons, Program Statement: Religious Beliefs and Practices, Statement P5360.09 (2004) ¶ 7(d) ("Inmate-led religious programs require constant staff supervision."); id. ¶ 7(a) ("Inmates may recite formulaic prayers in the language required by their religion. Sermons, original oratory, teachings and admonitions must be delivered in English."). We recognize that "prison officials . . . are infinitely more familiar with their own institutions than outside observers," Hamilton, 74 F.3d at 1556 n.15, and that as such, evidence of policies at one prison is not conclusive proof that the same policies would work at another institution. However, in the absence of any explanation by RIDOC of significant differences between the ACI and a federal prison that would render the federal policy unworkable, the Federal Bureau of Prisons policy suggests that some form of inmate preaching could be permissible without disturbing prison security.

RIDOC has adequately shown that its policy is the least restrictive means of achieving prison security.

Simply put, RIDOC must "demonstrate, and not just assert, that the rule at issue is the least restrictive means of achieving a compelling governmental interest." O'Bryan v. Bureau of Prisons, 349 F.3d 399, 401 (7th Cir. 2003). This does not conflict with our policy of deferring to the judgment of prison administrators. Rather, before we can evaluate whether deference is due, we require that prison administrators explain in some detail what their judgment is.[14] Here, RIDOC "offer[s] conclusory statements that a limitation on religious freedom is required for security, health or safety." Weaver v. Jago, 675 F.2d 116, 119 (6th Cir. 1982). To prevail on summary judgment, RIDOC must do more.

## C. Remedy

Spratt asks that we enter summary judgment in his favor. Alternatively, Spratt asks that we reverse summary judgment and remand the matter for discovery and trial on the merits. Summary judgment is proper only when "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). Denial of summary judgment is also appropriate where factual records are "disturbingly thin,"

---

[14] The level of deference to be accorded to prison administrators under RLUIPA remains an open question. RLUIPA's statutory requirement that we apply strict scrutiny to prison policies that substantially burden religious exercise may be in tension with the legislative history which suggests that courts should continue to defer to the expertise of prison administrators. Obviously, courts will need to find some balance between scrutiny of and deference to prison regulations. We need not resolve that question now because RIDOC has yet to present any reasoned judgment to justify the policies at issue in this case.

"contain gaps," and require judgment calls which depend on evidence not in the record but readily obtainable. See Mandel v. The Boston Phoenix, Inc., 456 F.3d 198, 205-07 (1st Cir. 2006). Notwithstanding Spratt's protestations to the contrary, it is clear that there are factual disputes, including whether a ban on inmate preaching furthers prison security, and whether a blanket ban is the least restrictive means necessary. The factual record on these issues is quite thin. As such, it would also be improvident at this point to grant summary judgment in favor of Spratt. We have held that entry of summary judgment for defendant was not warranted. Each side, on remand, may present further evidence and argument.

### III. Conclusion

For the foregoing reasons, we reverse the judgment of the district court and remand for further disposition in accordance herewith.

**Reversed and Remanded**.