Mac HUDSON and Derrick Tyler

v.

Kathleen DENNEHY, in her official capacity as Commissioner of the Massachusetts Department of Correction.

Civil Action No. 01–CV–12145–RGS.

United States District Court,
D. Massachusetts.

March 5, 2008.

Charles W. Anderson, Jr., Richard C. McFarland, Nancy Ankers White, Department of Correction, Boston, MA, for Defendants.

Benjamin A. Goldberger, Michael Kendall, James J. Marcellino, Neal E. Minahan, Jr., McDermott, Will & Emery LLP, Boston, MA, for Plaintiffs.

*FINDINGS OF FACT, RULINGS OF LAW, AND ORDER AFTER A NON–JURY TRIAL*

STEARNS, District Judge.

On May 4, 2001, state prison inmates Mac Hudson and Derick Tyler, who adhere to the religious teachings of Elijah Muhammad and the Nation of Islam, brought this civil rights suit against Kathleen Dennehy, the Commissioner of the Massachusetts Department of Correction (DOC), and other DOC defendants, seeking money damages and declaratory and injunctive relief. Hudson and Tyler are incarcerated at the Massachusetts Correctional Institution—Cedar Junction (MCI–CJ), a maximum security prison in Walpole, Massachusetts. The Complaint as originally filed alleged an abridgment of plaintiffs' rights under the Free Exercise Clause of the First and Fourteenth Amendments, as well as violations of 103 CMR 471.00 et seq. Plaintiffs claimed that the DOC had violated their religious rights by refusing to provide Muslim inmates with halal meals,[1] by requiring Muslim inmates to use a prayer "towel" rather than a traditional prayer rug while performing salat,[2] and by refusing to allow Muslim inmates confined in the Special Management Unit (SMU)[3] to participate

---

1. Halal means that which is authorized by Islamic law (fiqh). The halal dietary restrictions at issue in this case principally involve the slaughtering of animals for consumption. An Islamic website, eat-halal.com, describes the Halal slaughter ritual as follows.

 Animals such as cows, sheep, goats, deer, moose, chickens, ducks, game birds, etc., are also Halal, but they must be Zabihah (slaughtered according to Islamic Rites) in order to be suitable for consumption. The procedure is as follows: the animal must be slaughtered by a Muslim (or a Jew or Christian). The animal should be put down on the ground (or held if it is small) and its throat should be slit with a very sharp knife to make sure that the 3 main blood vessels are cut. While cutting the throat of the animal (without severing it) the person must pronounce the name of Allah or recite a blessing which contains the name of Allah, such as "Bismillah Allah–u–Akbar."

 While the method bears striking similarities to Kosher slaughter rituals, what is Kosher is not Halal, and vice-versa, in the Jewish and Muslim traditions.

2. Salat (or namaz) is the ritual prayer performed five times daily by an observant Muslim.

3. The Special Management Unit (SMU) is defined in 103 CMR 423.06 as "[a] separate housing area from general population within institutions in which inmates may be confined for reasons of administrative segregation, protective custody, or disciplinary detention." Inmates typically stay less than three months in the SMU, but detentions for as long as a year are not unheard of. The SMU at MCI–CJ is often referred to as "Ten Block."

in Jum'ah[4] services. Plaintiffs also argued that the DOC's policy of accommodating the dietary requirements of Jewish, Seventh Day Adventist, Buddhist, and other observant prisoners, while denying a similar accommodation to Muslim inmates, violated the Equal Protection Clause of the Fourteenth Amendment.[5]

## BACKGROUND

This action began with a *pro se* complaint filed in 2001 by inmates Hudson, Tyler, Antwan Crawford, Darrick Wilson, and Anthony Tucker.[6] Named as defendants were Michael Maloney, the Commission of the DOC; Peter Allen, Superintendent of MCI–CJ; Peter Pepe, former Superintendent of MCI–CJ; Andrea Emodi, former Director of Program Services; and Sherry Elliot, Director of Treatment at MCI–CJ. On March 29, 2004, the court entered an order denying plaintiffs' request for interim injunctive relief. On May 12, 2004, defendants filed a motion for summary judgment.[7] On July 23, 2004, the court issued a Memorandum and Order finding defendants exempted by qualified and official immunity from any claims for monetary damages. *Hudson,* 326 F.Supp.2d at

---

4. Jum'ah is a Friday group prayer that is obligatory for Muslims.

5. The Complaint also alleged that plaintiffs' religious beliefs were affronted by having to eat food prepared and served by non-Muslim inmates. The Complaint sought an injunctive order requiring that only Muslim inmates be permitted to prepare meals for other Muslim inmates. The court denied the request for injunctive relief, noting that the DOC's policy of assigning kitchen jobs on a nondiscriminatory basis served the compelling State interest of maintaining institutional harmony and order.

> [P]laintiffs' demand, that only Muslim inmates be permitted to prepare meals for other Muslim inmates, would not under any circumstances pass the test of *Turner,* 482 U.S. at 89, 107 S.Ct. 2254, as affirmed in a First Amendment context by [*O'Lone v.*] *Estate of Shabazz,* 482 U.S. [342] at 350–353, 107 S.Ct. 2400 [96 L.Ed.2d 282 (1987)]. Under the *Turner* test, a prison regulation, or practice that impinges on an inmate's constitutional rights, passes muster if it is reasonably related to a legitimate penological interest. As the court [has previously] observed ... "any special selection of inmates for food service positions based on their religious affiliation would violate the Department of Correction's policy of assigning jobs on a nondiscriminatory basis and [would] expose it to potential litigation, as well as resentment on the part of other inmates at the special treatment accorded to plaintiffs." Moreover, the Department's food service employment policy does not impinge on any constitutional right of the plaintiffs. As the Rahim affidavit explains, the Qu'ran specifically permits Muslims to consume food prepared by non-Muslims. Plaintiffs do not maintain that their desire to be served by Muslim food service workers is based on any Islamic teaching, but appears to have as its basis an expression of solidarity with Muslim [inmate] coreligionists.

*Hudson v. Maloney,* 326 F.Supp.2d 206, 212 n. 5 (D.Mass.2004). The court does not understand plaintiffs to press this issue further. Plaintiffs' expert on Muslim dietary laws, Mohammad Mazhar Hussaini, testified at trial that no Islamic teaching enjoins Muslims from eating Halal food prepared and served by non-Muslims so long as it is prepared in conformity with Islamic dietary laws. Hudson could not identify any religious basis for his beliefs about non-Muslim kitchen workers. Tyler, in his testimony at trial, did not appear to share Hudson's aversion to being served meals prepared by non-Muslims.

6. On October 18, 2002, the court dismissed the claims of Tucker and Wilson for want of prosecution pursuant to Fed.R.Civ.P. 41(b). Antwan Crawford was released from DOC custody on January 16, 2003, and was terminated as a party on March 29, 2004.

7. No opposition to the motion was filed by plaintiffs. They instead filed a motion on May 25, 2004, seeking to stay a decision on defendants' motion until the completion of discovery.

214. The court further determined that under the test of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987),[8] plaintiffs were not entitled to relief as a matter of law with regard to the DOC's ban on prayer rugs or its policy of assigning prisoners to kitchen service jobs on a nondiscriminatory basis. However, the court found that a triable issue of fact existed as to whether the DOC's refusal to provide Halal meals to Muslim inmates constituted an undue burden on plaintiffs' exercise of their religious beliefs. The court did not address plaintiffs' claims regarding Jum'ah services. The court then appointed counsel to represent plaintiffs.[9] Newly appointed counsel thereafter, on May 26, 2005, filed an Amended Complaint.[10]

The Amended Complaint, in addition to First and Fourteenth Amendment free exercise and equal protection claims, pled new causes of action under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc–1(a) (RLUIPA), the State Civil Rights Act, Mass. Gen. Laws ch. 12, § 11, and the Inmate Right of Worship Statute, Mass. Gen. Laws ch. 127, § 88, and related regulations. Discovery then proceeded.

On April 14, 2006, plaintiffs filed a motion urging the court to revisit the prayer rug issue based on "newly discovered" evidence. After a hearing, on August 31, 2006, the court granted plaintiffs' motion for reconsideration, thereby framing the three issues to be decided at trial: whether the DOC's refusal to provide regular Halal meals, its ban on traditional prayer rugs, and its refusal to permit inmates in the SMU to participate in Jum'ah services, substantially and unjustifiably burdened plaintiffs' exercise of their religious rights. In January of 2007, a six-day non-jury trial was held. Final arguments were heard in February of 2007. The parties were then given leave to file further pleadings.

*Defendant's Motion for Judgment on Partial Findings*

■ At the close of plaintiffs' case, Commissioner Dennehy filed a "motion for judgment on partial findings," arguing that all but one (the Halal meal issue) of plaintiffs' three claims were barred by the Prison Litigation Reform Act, 42 U.S.C. § 1997e (PLRA). The Commissioner contended that plaintiffs had failed to exhaust their administrative remedies as required by the PLRA. More specifically, she claimed that plaintiffs had failed to make a direct presentment of their religious grievances to the DOC's Religious Services Review Committee (RSRC) (they filed their grievances instead with the Superintendent of MCI–CJ), and had failed to use the proper Religious Service Request Form (RSRF) (they used the standard prisoner grievance form instead). The Commissioner argued that these procedures are mandated by the DOC's Religious Services Handbook (Handbook). The Handbook contemplates a process by which a request regarding the accommodation of a religious practice is first considered by the RSRC, which then forwards a recommendation to the Commissioner for a final determination. The court provisionally de-

---

**8.** Under *Turner,* a prison regulation or practice that impinges on an inmate's constitutional rights must be reasonably related to a legitimate penological interest.

**9.** The court commends plaintiffs' counsel, the law firm of McDermott Will & Emery, for agreeing to take on this important case without any assurance of being compensated for its efforts.

**10.** The Amended Complaint dismissed all individual defendants with the exception of Commissioner Dennehy, who is named in her official capacity only.

nied the motion, but deferred a final ruling until after the close of evidence and an opportunity for plaintiffs to reply to the newly asserted jurisdictional claim.

The Commissioner's exhaustion argument is unpersuasive. She does not dispute that Hudson and Tyler submitted repeated grievances regarding Halal meals, prayer rugs, and access to Jum'ah services. She also concedes that the DOC never distributed the Handbook to inmates, and moreover, that the Handbook was created to give guidance to prison administrators and not to inmates seeking to file grievances. Finally, the record shows that Dennehy's predecessor, Commissioner Michael Maloney, denied Hudson's and Tyler's three requests for accommodation, even though two of the requests were never formally reviewed by the RSRC. If the Commissioner failed to follow the procedures outlined in the Handbook, it is difficult to fault plaintiffs for failing to do better. *See Shaheed–Muhammad v. DiPaolo*, 393 F.Supp.2d 80, 96–97 (D.Mass.2005). Consequently, the Commissioner's motion for judgment on partial findings will be *DENIED.*

### FINDINGS OF FACT

The following findings of fact are drawn from the evidence and testimony adduced at trial as well as from the stipulations entered prior to trial by the parties.

1. Plaintiff Mac S. Hudson is serving a lengthy custodial sentence at MCI–CJ. At various times, Hudson has been confined in the SMU.

2. Plaintiff Derick Tyler is serving a lengthy custodial sentence at MCI–CJ. At various times, Tyler has been confined in the SMU.

3. Defendant Kathleen Dennehy was at the time of the filing of the Amended Complaint the Commissioner of the DOC.[11]

4. MCI–CJ is a maximum security prison owned and managed by the DOC, a department of the Commonwealth of Massachusetts. The prison is located in South Walpole, Massachusetts.

5. The DOC receives federal financial assistance.

6. Plaintiffs Hudson and Tyler belong to the Nation of Islam[12] and regard themselves as members of the worldwide Muslim community (umma). They subscribe to the teachings of the Qur'an as revealed by the Prophet Muhammad and by Elijah Muhammad. These teachings include dietary laws specifying the foods that a Muslim is permitted to eat (Halal) and those that are forbidden (haram).[13] Plaintiffs

11. Dennehy has since been succeeded as Commissioner by Harold W. Clarke.

12. The Nation of Islam was founded in 1930 in Detroit, Michigan, by Wallace Fard Muhammad. Elijah Muhammad was an early convert who came to preach that W. Fard Muhammad was God (Allah) incarnate. The Nation of Islam adheres to the Five Pillars of orthodox Muslim practice: Shahada (the profession of faith), salat, zakat (charitable tithing), the observance of Ramadan, and for those who are able, the duty to make Hajj (the pilgrimage to Mecca). The Nation of Islam also subscribes to Islamic dietary restrictions, including the ban on consumption of pork and alcohol. The Nation of Islam differs from orthodox Islam in, among other beliefs, its championing of the racial superiority of blacks, its belief that Allah manifested himself in the person of W. Fard Muhammad, and its belief that Elijah Muhammad succeeded the Prophet Muhammad as the messenger of Allah.

13. There are six basic categories of food that Islam defines as haram: alcohol, blood, carnivorous animals and birds of prey, carrion, animals sacrificed to a deity other than Allah, and swine. Plaintiffs to differing degrees subscribe to the additional dietary restrictions espoused by Elijah Muhammad. These include a ban on the consumption of wheat, corn, large beans, and any fish that weighs in

also believe that traditional prayer rugs should be used in performing salat and that they are obligated to participate in the weekly Jum'ah services. The court has previously found that plaintiffs' beliefs, while deviating from those of orthodox Islam, are sincerely held. The Commissioner does not challenge this finding.

7. The DOC permits Muslim inmates to fast during the month of Ramadan,[14] to celebrate the two annual feasts of Eid,[15] to pray five times daily (salat) using a "prayer towel," [16] to wear a kufi (skull cap), and to possess prayer beads, prayer oil, and a Qur'an. The DOC provides Halal meat for the Eid feasts.

8. The DOC houses over 10,000 inmates who are served three meals daily. The DOC offers four basic menus: the regular menu, which does not include pork or pork by-products; an alternative vegetarian menu;[17] a Kosher menu; and a medical menu (which requires a doctor's prescription). All of the menus, including the alternative vegetarian menu, are served in twenty-one day cycles. Pork products are not permitted in any of the DOC's institutional kitchens.

9. The meals comprising the four menus are prepared under the supervision of a registered dietician. They meet the Recommended Dietary Allowance (RDA) standards of the Food and Nutrition Board, the National Academy of Sciences, the National Resource Council, and the American Correctional Association. The alternative vegetarian menu contains meatless items made of wheat, soy, and other vegetable products that provide RDA nutritional values comparable to those of the meat-inclusive menus.[18]

10. The DOC offers daily Kosher meals, including meat, to Jewish inmates who request a Kosher diet. The DOC provides the alternative vegetarian diet to Muslim inmates who request it. The DOC does not offer Muslim inmates a strictly Halal diet. The DOC provides Muslim inmates with Halal meat during the Feasts of Eid.

11. The number of Muslims in the Massachusetts prison population far exceeds the number of Jewish inmates. At present, there are no Jewish inmates at MCI–CJ who are served Kosher meals.

---

excess of fifty pounds. While Hudson testified that he believes it "sinful" for a Muslim not to eat meat, he could articulate no religious basis for this conviction. Tyler is a vegetarian and does not eat meat of any kind.

14. During Ramadan (the ninth month of the Islamic lunar calendar), Muslims are required to abstain from eating, drinking, or smoking from before sunrise until after sunset.

15. Eid is an Arabic word meaning festival. The Feast of Eid al-Fitr marks the end of Ramadan. The Feast of Eid al-Adha celebrates the end of the Hajj pilgrimage and is the holiest of Muslim religious holidays.

16. The "prayer towel" is a 22″ by 43″ white cotton bath towel issued by the DOC with the word "PRAYER" inscribed on its fringe in black marker ink.

17. The alternative vegetarian menu was introduced by the DOC in 2000 to accommodate inmates who for religious or personal reasons eschew meat. It was not specifically designed to meet the dietary needs of Muslim inmates.

18. Plaintiffs do not challenge the nutritional sufficiency of the four menu offerings. Plaintiffs' expert, Mohammad Mazhar Hussaini, testified that the menus, including the vegetarian alternative, are nutritionally adequate. He also agreed that nothing in Islam requires a Muslim to eat meat. He testified, however, that a vegetarian diet is not necessarily Halal, as certain non-meat products, such as peanut butter and yoghurt, are processed with non-Halal additives.

12. Jewish dietary laws require that Kosher food be prepared using dedicated pots, pans, plates, bowls, and utensils. Different sets of cookware must be used to prepare meat dishes and dairy products.

13. Muslim dietary laws have similar rules intended to prevent the "cross-contamination" of food.

14. Former Commissioner Michael Maloney denied Tyler's and Hudson's requests to be served Halal meals after receiving a negative recommendation from the RSRC.

15. Pre-prepared Halal meals are commercially available, although at three times the cost of Kosher meals and at five to ten times the cost of the regular prison menu or the vegetarian alternative. However, the DOC's decision not to offer Halal meals was not influenced by considerations of price. According to Deputy Superintendent Timothy Hall, the sole basis for the decision was a concern that non-Muslim inmates might resent any special treatment accorded to Muslim inmates.[19]

16. Other prison systems, including the Federal Bureau of Prisons, provide Halal meals to Muslim inmates. The DOC presented no evidence that these prison systems have experienced disruption or conflict among inmates as a result.

17. DOC regulations prohibit inmates confined in a SMU from participating personally in group religious services or other group activities.

18. The DOC does not broadcast Jum'ah services over closed-circuit television to SMU inmates on Ten Block at MCI–CJ. There are no technical obstacles that prevent the DOC from doing so.

19. The Departmental Disciplinary Unit (DDU) at MCI–CJ is defined in 103 CMR 430.06 as a segregated unit in a restricted area designated by the Commissioner in which an inmate who has received a sentence recommended by a Special Hearing Officer after a disciplinary hearing is confined.

20. The DOC broadcasts Jum'ah services over closed-circuit television to inmates confined in the DDU at MCI–CJ.

21. DOC property regulations, 103 CMR 403.00 et seq., place strict limits on the types of personal property that inmates may keep in their cells. The DOC does not permit inmates to possess prayer rugs because of a concern that their bulk and decorative fringes might facilitate the concealment of weapons and other contraband.

22. Neither the DOC's ban on traditional prayer rugs, nor its requirement that inmates use prayer towels as a substitute, has prevented Hudson and Tyler from performing salat.

### RULINGS OF LAW

1. RLUIPA provides that

[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a)

2. As the First Circuit explained in *Spratt v. Rhode Island Dep't of Corrs.,*

---

**19.** Deputy Superintendent Hall testified that friction resulted from the DOC's decision to offer Kosher meals to Jewish prisoners, but he could recall only one actual incident during his many years at the DOC.

482 F.3d 33 (1st Cir.2007), "[a] claim under RLUIPA includes four elements. On the first two elements, (1) that an institutionalized person's religious exercise has been burdened and (2) that the burden is substantial, the plaintiff bears the burden of proof.... Once a plaintiff has established that his religious exercise has been substantially burdened, the onus shifts to the government to show (3) that the burden furthers a compelling governmental interest and (4) that the burden is the least restrictive means of achieving that compelling interest." *Id.* at 38.

 3. RLUIPA should be applied with particular sensitivity when security concerns are legitimately at issue. "It bears repetition ... that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Spratt,* 482 F.3d at 39, quoting *Cutter v. Wilkinson,* 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). *See also Longoria v. Dretke,* 507 F.3d 898, 904 (5th Cir.2007); *Washington v. Klem,* 497 F.3d 272, 283 (3d Cir.2007). *Cf. Johnson v. California,* 543 U.S. 499, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) ("necessities of prison security and discipline" are a compelling government inter-

est in justifying narrowly tailored racial classifications).

 4. RLUIPA does not confer "privileged status on any particular sect, and singles out no bona fide faith for disadvantageous treatment." *Cutter,* 544 U.S. at 724, 125 S.Ct. 2113. The statute does not permit a court to determine whether the belief or practice in question is "compelled by, or central to, a system of religious belief." A plaintiff, however, must establish that the exercise forms a legitimate part of his or her profession of faith. 42 U.S.C. § 2000cc–5(7)(a). The statute in this regard does not preclude a court from inquiring into the sincerity of an inmate's professed beliefs. *Cutter,* 544 U.S. at 725 n. 13, 125 S.Ct. 2113.

5. The statute does not define "substantial burden." However, Supreme Court precedent identifies the existence of such a burden when government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs...." *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *see Spratt,* 482 F.3d at 38 (assuming, *arguendo,* that the *Thomas* standard is generally applicable).[20] "[I]ncidental ef-

---

**20.** The First Circuit has yet to offer a conclusive definition of a "substantial burden." Other circuits have adopted formulations of the *Thomas* standard or the slightly stricter standard suggested in *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (a substantial burden exists when an adherent is forced "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept [a benefit], on the other hand."). *See Lovelace v. Lee,* 472 F.3d 174, 187 (4th Cir. 2006) (a substantial burden "occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.' "), quoting *Thomas,* 450 U.S. at 718, 101 S.Ct. 1425; *Midrash Sephardi, Inc.*

*v. Town of Surfside,* 366 F.3d 1214, 1227 (11th Cir.2004) ("[A] substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct."); *Adkins v. Kaspar,* 393 F.3d 559, 570 (5th Cir. 2004) ("[A] government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs.... [A] government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs."). In practice, it is not clear that the

fects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," are not affected by this standard. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988).

6. Once the prisoner demonstrates a substantial burden, the government must show that the disputed policy is the least restrictive means of furthering a compelling State interest.

7. A compelling State interest must be more than a colorable interest, or an interest serving the convenience of the State. "Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation...." *Sherbert*, 374 U.S. at 406, 83 S.Ct. 1790, quoting *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945). " 'Context matters' in the application of that standard." *Cutter*, 544 U.S. at 723, 125 S.Ct. 2113, quoting *Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). While it is beyond cavil that maintaining prison security is a compelling State interest deserving of scrupulous deference by the courts, "merely stating [that there is] a compelling interest does not fully satisfy [the government's] burden on this element of RLUIPA." *Spratt*, 482 F.3d at 39. Rather, prison authorities must provide some basis for their concern and the policy at issue must be narrowly tailored to further this interest by the least restrictive means possible. *Klem*, 497 F.3d at 283, citing *Spratt*, 482 F.3d at 39.

8. A "least restrictive means" is one that does not sweep "more broadly than necessary to promote the government's interest. That consideration ...

decisional nuances in defining a substantial

cannot be done without some evaluation of the alternative measures put in issue by the parties." *Casey v. City of Newport*, 308 F.3d 106, 114 (1st Cir.2002). Prison authorities, in other words, must consider and reject other plausible means before determining that the policy they implement is the least restrictive means of furthering a compelling State interest. *Spratt*, 482 F.3d at 41, citing *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir.2005). Although RLUIPA does not "require prison administrators to refute every conceivable option to satisfy the least restrictive means prong ... their rejection [of competing alternatives] should generally be accompanied by some measure of explanation." *Spratt*, 482 F.3d at 41 n. 11 (internal quotations and citations omitted).

9. Evidence that the Federal Bureau of Prisons allows a religious practice that is not permitted by a state prison system is relevant to the inquiry of whether the State has chosen the least restrictive means of achieving a compelling State interest. *Spratt*, 482 F.3d at 42 ("[E]vidence of policies at one prison is not conclusive proof that the same policies would work at another institution. However, in the absence of any explanation by [defendant] of significant differences between [its policies] and a federal prison that would render the federal policy unworkable, the Federal Bureau of Prisons policy suggests that [the banned conduct] could be permissible without disturbing prison security.").

### ULTIMATE CONCLUSIONS OF FACT AND LAW

1. Plaintiffs' desire to observe a Halal diet that conforms to the teachings of the Qur'an and the Nation of Islam is a "religious exercise" within the meaning of RLUIPA.

burden have any practical significance.

■ 2. The DOC's refusal to provide a daily Halal menu to Muslim inmates substantially burdens plaintiffs' exercise of their religious beliefs by creating pressure on plaintiffs to consume meals that do not conform with their understanding of the requirements of Islamic law.[21]

■ 3. The DOC has failed to satisfy its burden of showing that its refusal to provide regular Halal meals furthers a compelling State interest. The DOC concedes that the added costs of providing Muslim inmates with Halal meals did not factor in its decision to refuse plaintiffs' requests. Defendant produced little if any evidence validating its assertion that serving Halal meals to Muslim inmates would ignite inmate conflict. (The Federal Bureau of Prisons has allowed inmate access to certified, pre-packaged Halal meals since 1996 without incident). If anything, the DOC's long standing practice of providing dietary accommodations to Jewish, Buddhist, and Seventh Day Adventist inmates, among others, with only one anecdotal instance of resulting friction, proves the opposite of the DOC's assertion.[22]

■ 4. The "alternative vegetarian" diet is not a satisfactory substitute as it does not in many significant respects conform to plaintiffs' sincerely held religious beliefs.

5. As with Kosher foods, there are available vendors willing and able to provide pre-packaged Halal-certified meals in quantities sufficient to serve the 50 to 90 Muslim inmates at MCI–CJ that Acting Superintendent Marshall estimated might request such meals.

■ 6. Although prayer rugs are often used in the Muslim prayer ritual, Hudson and Tyler have failed to establish that the use of a prayer towel substantially burdens their ability to perform salat. Moreover, this issue has been definitively and authoritatively addressed by the Massachusetts Supreme Judicial Court. *See Rasheed v. Comm'r of Corr.*, 446 Mass. 463, 473–474, 845 N.E.2d 296 (2006) (the DOC's policy of providing inmates with a prayer towel rather than permitting the use of a prayer rug does not violate an inmate's rights under the Free Exercise Clause of art. 16 of the Massachusetts Declaration of Rights); *Ahmad v. Dep't of Corr.*, 446 Mass. 479, 486, 845 N.E.2d 289 (2006) (same, First Amendment and

---

**21.** The court recognizes that other courts have reached a different conclusion. *See, e.g., Allah v. Jordan–Luster*, No. 04–1083, 2007 WL 2582199 (C.D.Ill. Aug. 3, 2007) (no accommodation required for a Halal diet including "ritualistically-slaughtered" meat where plaintiff acknowledged that a vegetarian diet was an adequate alternative and would not violate his faith); *Spruel v. Clarke*, No. C06–5021 RJB, 2007 WL 1577729 (W.D.Wash. May 31, 2007) (denial of Halal meat did not burden plaintiff's religious exercise); *Pratt v. Corrs. Corp. of Am.*, No. 03–3259, 2006 WL 2375656 (D.Minn. Aug. 16, 2006) ("Plaintiff has failed to present any evidence that he must receive all foods that are Halal in order to fulfill his religion or that receiving [H]alal meat is a central tenet of his religion."). RLUIPA, however, specifically bars inquiry into whether a particular religious exercise is "compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(a). While not perhaps a compelling distinction, these cases focused on plaintiffs' desire to be provided with Halal meat. Plaintiffs' Amended Complaint is focused more on obtaining a Halal menu consistent with their beliefs, than with demands for specific items of food, like meat.

**22.** It is worth noting that Congress has already identified a prison's refusal to provide a Halal diet as an "egregious and unnecessary" restriction on an inmate's religious liberty. *Cutter*, 544 U.S. at 716, 125 S.Ct. 2113. "The hearings held by Congress revealed, for a typical example, that 'a state prison in Ohio refused to provide Moslems with Halal food, even though it provided Kosher food.'" *Id.* at 716 n. 5, 125 S.Ct. 2113.

RLUIPA).[23] "The purpose of the prayer rug is to ensure that [its user] is not in direct contact with the impurities of the floor when he prays. The record establishes that purpose is satisfied by the use of a prayer towel that is comparable in size, other than thickness (an irrelevant characteristic) to a prayer rug." *Rasheed,* 446 Mass. at 473, 845 N.E.2d 296. This court is fully in agreement with the Supreme Judicial Court on this issue.

7. Participating in the Jum'ah service is a religious exercise within the meaning of RLUIPA.

8. The DOC's ban on participation in Jum'ah services by inmates confined in the SMU (Ten Block) substantially burdens plaintiffs' practice of a core tenet of their faith.

9. The DOC's ban on personal participation in Jum'ah services by inmates confined in Ten Block serves the compelling State interest of rehabilitating prisoners and promoting good order. Inducing prisoners to comply with prison rules by limiting certain liberties is consistent with this interest. *Cutter,* 544 U.S. at 722–723, 125 S.Ct. 2113 ("While [RLUIPA] adopts a compelling governmental interest standard, context matters in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.") (internal quotations and citations omitted).

10. The ban on participation by Ten Block inmates in Jum'ah services by closed-circuit television is not the least restrictive means of vindicating the compelling State interest at issue. To the extent that the State seeks to promote order through discipline, denial of the privilege of personal participation in Jum'ah services adequately serves that interest. Moreover, the DOC has not suggested any meaningful distinction between inmates confined in the DDU, who are permitted closed-circuit access to Jum'ah services, and inmates in the SMU, who are not.[24]

## ORDER

For the foregoing reasons, the court will enter judgment in part for plaintiffs. The Commissioner's motion for judgment on partial findings is *DENIED.* The court will grant plaintiffs' prayers for declaratory judgment on the issues of Halal meals and closed-circuit television access to Jum'ah services while confined in Ten Block. Judgment will enter for defendant on the prayer rug issue.[25] No money damages are awarded. Plaintiffs will within ten (10) days of date of the entry of this Order file a Proposed Form of Final Judgment. Defendant will have seven (7) days thereafter to comment. On entry of Final

23. Other courts have reached the same conclusion. *See, e.g., Mohammad v. Beard,* No. 05–580, 2007 WL 1439051, at *10 (W.D.Pa. May 16, 2007) ("Here, the court finds that Plaintiff has not met his burden to demonstrate that denial of a prayer rug imposes a substantial burden on his religious belief. . . . [A] prayer rug is not essential to Plaintiff praying, rather, the essential requirement for Plaintiff to pray is that the area on which he prays be clean. Hence, a clean towel or linen can suffice or even a cleaned floor. Nor has Plaintiff shown that this is not the case.") (internal citations omitted).

24. As previously indicated, the DOC does not contend that there is any technical reason that prevents the broadcast of Jum'ah services by closed-circuit television to Muslim inmates in Ten Block.

25. The Amended Complaint also seeks a declaration enjoining the DOC from requiring plaintiffs to register their Muslim religious faith prior to attending or witnessing Jum'ah services. No evidence that the DOC in fact imposes such a requirement was offered by plaintiffs at trial.

Judgment, the Clerk may close the case. The court will, however, retain jurisdiction to oversee the implementation of any remedial aspects of the Judgment.[26]

SO ORDERED.

---

**26.** Plaintiffs' counsel may submit a petition for an award of attorneys' fees in due course properly segregating compensable from non-compensable claims and supported by appropriately documented billing records. *See Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984).