## NATHANIEL BILAL AHMAD vs. DEPARTMENT OF CORRECTION & others.[1]

Middlesex. September 8, 2005. - April 7, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Freedom of religion, Equal protection of laws. *Religious Land Use and Institutionalized Persons Act of 2000. Imprisonment,* Enforcement of discipline. *Governmental Immunity. Civil Rights,* Immunity of public official.

In an action brought by an inmate against the Department of Correction and certain of its employees, alleging that he was unlawfully prevented from practicing his Islamic faith by reason of prison restrictions on meals and the possession of various religious items, the judge did not err in granting summary judgment in favor of the defendants on the plaintiff's claims of violation of 42 U.S.C. § 1983; the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc et seq.; arts. 1 and 2 of the Massachusetts Declaration of Rights; art. 46 of the Amendments to the Massachusetts Constitution; and the Massachusetts Civil Rights Act, G. L. c. 12, § 11, where the defendants were entitled to qualified immunity based on the record, which reflected that the defendants had attempted to accommodate the religious needs and requests of inmates practicing the Islamic faith, within bounds that they reasonably concluded were lawful and necessary to maintain the secure and efficient operation of the prison. [484-488]

CIVIL ACTION commenced in the Superior Court Department on December 20, 2000.

The case was heard by *Leila R. Kern,* J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Neil McGaraghan (Katherine W. Grearson* with him) for the plaintiff.

*Richard C. McFarland* for the defendants.

[1]Commissioner of Correction and the superintendent of the Souza-Baranowski Correctional Center.

CORDY, J. Nathaniel Bilal Ahmad, a devout Muslim, was an inmate in the custody of the Department of Correction (department) from 1995 to 2002. In December, 2000, he commenced this action against the department and certain of its employees, seeking declaratory and injunctive relief, and money damages for violations of the free exercise and equal protection clauses of the United States Constitution; 42 U.S.C. § 1983 (2000); the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc et seq. (2000); arts. 1 and 2 of the Massachusetts Declaration of Rights; and art. 46 of the Amendments to the Massachusetts Constitution; and the Massachusetts Civil Rights Act (MCRA), G. L. c. 12, § 11. Central to Ahmad's claims is the allegation that he was unlawfully prevented from practicing his Islamic faith by reason of prison restrictions on meals and the possession of various religious items.

In April, 2001, the individual defendants moved to dismiss the complaint for failure to state a claim on which relief could be granted, arguing, among other things, that they were entitled to qualified immunity. In denying the motion, a judge in the Superior Court concluded that it was "premature to say that there are no facts overcoming the defendants' claims of qualified immunity." In January, 2003, the defendants moved for summary judgment on qualified immunity grounds. The motion was denied without prejudice to permit sufficient discovery regarding the applicability of qualified immunity. In February, 2004, they renewed their motion for summary judgment. The motion was allowed and the case was dismissed in its entirety. In her memorandum of decision, the motion judge addressed Ahmad's claims for declaratory and injunctive relief, concluding that they were moot, as well as his retaliation claims under the MCRA, but did not specifically explain her reasoning for dismissing the money damages claims against the individual defendants except to note that another judge in the Superior Court "has already decided that inmates do not have a constitutional right to receive Halal meals." Ahmad appeals from the dismissal of his claims for money damages against the individual defendants.

We transferred the case to this court on our own motion. For

the following reasons, we affirm the granting of summary judg-
ment in the defendants' favor.

1. *Background.* From December, 1999, until his release from
custody on January 19, 2002, Ahmad was incarcerated at the
Souza-Baranowski Correctional Center (SBCC), a maximum
security prison. The individual defendants are the superintendent
of SBCC from September, 1999, until November, 2000; the
SBCC superintendent, beginning in December, 2000; and the
Commissioner of the department during the relevant period.
While incarcerated, Ahmad sought a diet that did not violate his
Islamic faith, as well as access to a variety of Islamic religious
items, notably prayer oil, a prayer rug, and an Islamic medallion.

a. *Religious accommodations.* Article 46 parallels the First
Amendment to the United States Constitution in guaranteeing
the free exercise of religion.[2] Section 4 of art. 46 further
provides that "any inmate of a . . . penal . . . institution" shall
not be deprived "of the opportunity of religious exercise therein
of his own faith." This provision of the Massachusetts Constitu-
tion is incorporated into and expanded on in G. L. c. 127, § 88,
which, in relevant part, provides that an inmate "shall not be
denied the free exercise of his religious belief and the liberty of
worshipping God according to the dictates of his conscience in
the place where he is confined." The statute further provides,
however, that it "shall not be so construed as to impair the
discipline of any such institution so far as may be needed for
the good government and the safe custody of its inmates."

In order that a proper balance between the exercise of
religious freedoms and the needs of security might be struck,
the Legislature provided the commissioner, his deputies, and
superintendents with the authority to establish policies, rules,
and regulations regarding inmate religious programs. See G. L.
c. 124, § 1 (*q*); G. L. 124, § 2; G. L. c. 125, § 14. Pursuant to
this authority, the commissioner promulgated 103 Code Mass.
Regs. §§ 471.00 (1998), establishing departmental guidelines
with respect to religious programs and services in the State's
penal institutions. In addition, the department prepared and
published in April, 1999, a Religious Services Handbook

---

[2]Section 1 of art. 46 of the Amendments to the Massachusetts Constitution
provides: "No law shall be passed prohibiting the free exercise of religion."

(handbook) to serve as a tool and reference source for its prison administrators, and amended its property regulations regarding the possession of religious items.[3] Among other things, the handbook describes a wide range of religions and religious practices, and sets forth lists of religious items, the possession of which are approved for inmates. The handbook draws on similar handbooks utilized in different States, and was prepared with the input of clergy from different religions. It is available to all inmates in their respective prison libraries, and, among other things, outlines the process for acquiring religious items.

At SBCC, inmates' requests for religious items and practices beyond those permitted in the handbook or in the regulations may be made by filling out a religious services request form that is submitted to the institution's director of treatment. The director of treatment then reviews the form and makes a recommendation to the superintendent of the facility for review. The superintendent makes comments, and his own recommendation, and then forwards the request to the department's religious services review committee (committee). The committee is comprised of three assistant deputy commissioners, each of whom is a former superintendent knowledgeable on institutional security concerns, and is chaired by the department's director of program services. The committee reviews the inmate's request, any supporting documentation provided, and the institution's recommendation. It then makes a recommendation that is subsequently reviewed by the deputy commissioner and the commissioner.

The department provides Muslim inmates with regular access

[3]The commissioner amended the inmate property regulations through the formal promulgation process to add 103 Code Mass. Regs. § 403.10(9) (2001) providing: "A list of approved religious articles will be posted quarterly in the inmate libraries. If an inmate has a request for an item that is not on the list of approved religious articles, the inmate should submit his or her request to the Superintendent. The Superintendent will forward the request with a recommendation to the Religious Services Review Committee through the Director of Program Services for review. The Religious Services Review Committee consists of three Assistant Deputy Commissioners, the Director of Offender Management and Placement and the Director of Program Services. This committee shall meet on an as-needed-basis to review requests for religious articles that are not already approved for retention and shall forward their recommendations to the Commissioner for his approval."

to a religious leader, religious services, and religious education classes; the ability to pray five times a day; the use of a prayer towel, prayer oil, a skull cap called a kufi; a religious medallion on a chain; prayer beads; the ability to celebrate religious feasts and Ramadan; and access to religious books, including the Islamic holy book, the Quran. When Ahmad entered prison in 1995, Muslim inmates were provided with a pork-free diet. In 2000, the department provided Muslim inmates the option of selecting an alternative vegetarian diet, which is also made available to and meets the requirements of inmates practicing several different religions including Buddhists, Rastafarians, Hare Krishnas, Hindus, and Seventh Day Adventists.

b. *Ahmad's claims.* Viewed in its light most favorable to the plaintiff, the record reveals the following facts with respect to Ahmad's claims.[4]

*Prayer oil.* Ahmad follows the Muslim practice of praying to Allah five times daily. Prior to praying, Ahmad applies prayer oil by dabbing it onto his face and neck. The department restricted the amount of prayer oil that could be purchased by an inmate to one one-ounce bottle every three months. Ahmad alleges that this amount was insufficient and thus he was forced to pray without prayer oil for months at a time.

*Prayer rug.* Ahmad's daily prayers are performed by kneeling and lowering the head and body to a prostrate position on the ground. Muslims utilize a prayer rug to ensure that no part of the body comes into contact with the impurities on the ground. The department provided Ahmad and other Muslim inmates with a prayer towel comparable in dimension (other than thickness) to a prayer rug. However, Ahmad alleges that the prayer towel is too small to prevent the body from coming into contact with the ground.

*Religious medallion.* Muslim inmates may purchase Islamic medallions that meet specifications as to cost, length and thickness of chain, and size of medallion from an approved vendor. However, no Islamic medallions were available for purchase

---

[4]The department does not contend that Ahmad's beliefs are not sincerely held. "Conduct motivated by sincerely held religious convictions will be recognized as the exercise of religion." *Attorney Gen.* v. *Desilets*, 418 Mass. 316, 323 (1994).

between October, 2000, and December, 2001, because the approved vendor stopped selling the medallions and the search for a new vendor took approximately thirteen months to complete.

*Diet.* Ahmad believes that his Islamic faith imposes on him a strict set of dietary laws, according to which all food is either halal (lawful) or haram (not lawful). Pork and pork byproducts, meats not properly slaughtered according to the Quran, and any foods prepared with haram ingredients are all considered haram. The department has four menus available to the over 10,000 inmates in its custody: (1) a regular menu available to all inmates which is free of pork and pork byproducts; (2) an alternative vegetarian menu; (3) a kosher menu for Jewish inmates; and (4) a medical diet menu. Beginning in December, 2000, Muslim inmates were permitted access to the alternative vegetarian menu in addition to the regular pork-free menu. From 1995 to 2000, Ahmad ate from the pork-free menu. After December of 2000, Ahmad ate from the alternative vegetarian menu. Ahmad disputes whether the pork-free and the vegetarian menus provide a diet consistent with his religious scruples.[5]

2. *Discussion.* The doctrine of qualified immunity shields government officials, performing discretionary tasks, from liability for civil damages under both Federal and State law, *Duarte* v. *Healy,* 405 Mass. 43, 47 (1989), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Shedlock* v. *Department of Correction,* 442 Mass. 844, 859 (2004), quoting *Harlow* v. *Fitzgerald,* 457 U.S. 800, 818 (1982). For a right to be clearly established, the unlawfulness of the defendants' conduct must be "apparent" based on then existing law. *Anderson* v. *Creighton,* 483 U.S. 635, 640 (1987). To determine whether a reasonable official would have known that his conduct violated a clearly established right, we make an objective inquiry into the legal reasonableness of the official action. That determination is a question of law. *Clancy* v. *McCabe,* 441 Mass. 311, 323 (2004). Finally, we recognize that the qualified immunity standard " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or

---

[5]Throughout Ahmad's incarceration, halal meat meals were also provided to Muslim inmates on certain Islamic holy days.

those who knowingly violate the law.' " *Hudson* v. *Maloney*, 326 F. Supp. 2d 206, 210 (D. Mass. 2004), quoting *Rivera* v. *Murphy*, 979 F.2d 259, 263 (1st Cir. 1992).

On a motion for summary judgment, the relevant inquiry is "whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information that the official possessed at the time of his allegedly unlawful conduct." *Clancy* v. *McCabe, surpa* at 317, quoting *Febus-Rodriguez* v. *Betancourt-Lebron* 14 F.3d 87, 91 (1st Cir. 1994).

In *Rasheed* v. *Commissioner of Correction, ante* 463, 467 (2006), we adopted the standard set out in *Attorney Gen.* v. *Desilets*, 418 Mass. 316, 321-323 (1994), for the review of prison regulations and policies that burden the rights of inmates to practice freely their religious beliefs as guaranteed by the Massachusetts Constitution. Under that standard, such regulations and policies must advance compelling State interests and be tailored narrowly in pursuit of those interests. *Rasheed* v. *Commissioner of Correction, supra.* This is a stricter standard of scrutiny than the United States Supreme Court adopted in *Turner* v. *Safley*, 482 U.S. 78 (1987), for the review of prison regulations that infringe on rights guaranteed by the United States Constitution. Such regulations are judged under a "reasonableness" test, less restrictive than ordinarily applied to the infringement of fundamental rights. *O'Lone* v. *Estate of Shabazz*, 482 U.S. 342, 348, 349 (1987) (*Turner* standard applies to "free exercise" claims of inmates).

While RLUIPA holds the government to a higher standard than that required in the *Turner* case with respect to the free exercise of religion clause of the First Amendment, that standard is consistent with the stricter standard we adopted in *Rasheed* v. *Commissioner of Correction, supra* at 472-475.[6] In other words, if the prison regulations and policies challenged by Ahmad are

[6]The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc-1(a) (2000) (RIULPA), provides that: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

permissible under the Massachusetts Constitution, they will meet the requirements of RLUIPA.

In *Rasheed* v. *Commissioner of Correction, supra,* we determined that prison regulations and policies limiting quantities of prayer oil and permitting inmates the use of only a prayer towel rather than a prayer rug did not violate the Massachusetts Constitution.[7] For the same reasons, we conclude that they do not violate RLUIPA. Summary judgment was therefore properly granted as to the claims for damages related to such policies and regulations.

With respect to Ahmad's claim that his right to possess a religious medallion was violated by a thirteen-month delay incurred while the department searched for a replacement vendor, the law is clear that a policy permitting only prescreened vendors to sell personal property items, including religious items, does not violate established law. See, e.g., *Vaughn* v. *Garrison,* 534 F. Supp. 90, 93 (E.D.N.C. 1981) (holding restriction of ordering prayer rugs from certain companies designated by prison as reasonable and substantially justified to promote prison discipline and order). Further, delays based on neutral administrative policies and valid penological concerns do not violate an inmate's rights. See Barnes *vs.* O'Dea, No. 93-6295 (6th Cir. Aug. 16, 1994) (delay in permitting Muslim inmate to participate in Ramadan justified by officials' reasonable attempts to confirm inmate was Muslim); Mayweathers *vs.* Gomez, No. C94-3297 FMS (N.D. Cal. Sept. 19, 1997) (finding denial or delay of orders of religious materials not in violation of equal protection clause). Even courts that have considered regulations prohibiting the possession of Islamic medallions by inmates have concluded that they were permissible. See *Rowland* v. *Sigler,* 327 F. Supp. 821, 828 (D. Neb. 1971) (upholding regulation prohibiting medallion). Ahmad has failed to establish that the delays incurred violated any constitutional or statutory rights. Summary judgment was properly granted on this claim as well.

Finally, with respect to Ahmad's claim that the provision of a

---

[7]Ahmad's claim under the free exercise clause of the First Amendment to the United States Constitution readily fails under the more lenient standard of *Turner* v. *Safley,* 482 U.S. 78 (1987).

pork-free diet or a vegetarian diet was not consistent with his religious scruples, the precise question presented is whether, during the relevant time the law had clearly established a Muslim's right to a particular dietary ingredient (halal meat) or whether it was sufficient for prison officials to provide an alternative diet (pork-free or vegetarian) that was consistent with the inmate's faith, if not every aspect of his belief. See *Hudson* v. *Maloney*, 326 F. Supp. 2d 206, 211 (D. Mass. 2004). In consulting decisions of courts that had considered this issue before 2002, a prison official would learn that an overwhelming majority of them had determined that prison officials permissibly discharged their duty to respect the dietary beliefs of Muslim inmates by offering a pork-free diet, and more broadly, that the law permitted prison officials to limit the dietary options available to inmates in the interests of reducing the costs and burdens entailed in accommodating the diverse food-related religious beliefs likely to be found in a prison population. See *id.* (analyzing decisional law prior to 2002).[8] In this context, a

---

[8]See also *O'Lone* v. *Estate of Shabazz*, 482 U.S. 342, 352 (1987) (citing practice of giving Muslim prisoners different meal whenever pork is served as example of how Muslim inmates could freely observe their religious obligations); *Williams* v. *Morton*, 343 F.3d 212 (3d Cir. 2003) (prison not required to provide Muslim inmates with halal meat because vegetarian meals provided); *Kind* v. *Frank*, 329 F.3d 979, 981 (8th Cir. 2003) (jail officials entitled to qualified immunity where policy of providing Muslim inmate with pork-free diet was objectively reasonable); *DeHart* v. *Horn*, 227 F.3d 47, 53 (3d Cir. 2000) ("prison's interest in an efficient food system and in avoiding inmate jealousy are legitimate penological concerns"); *Ward* v. *Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (courts must balance impingement on right of free exercise of religion against cost of accommodation and whether alternate means by which inmate can practice his religion available); *Kahey* v. *Jones*, 836 F.2d 948, 950 (5th Cir. 1988) ("prisons need not respond to particularized religious dietary requests"); *Muhammad* v. *Warithu-Deen Umar*, 98 F. Supp. 2d 337, 344-345 (W.D.N.Y. 2000) (no constitutional violation where Muslim inmate denied kosher meals because available religious alternative menu did not offend any Muslim dietary requirement); *Denson* v. *Marshall*, 59 F. Supp. 2d 156, 158-159 (D. Mass. 1999), aff'd, 230 F.3d 1347 (1st Cir. 2000) (no constitutional violation where Muslim inmate in disciplinary unit denied request for special food items to be delivered before sunrise during fast days); *Wesley* vs. *Kalos*, No. 97 Civ. 1598 (RWS) (S.D.N.Y. Dec. 11, 1997) (inmate's complaint that he was not provided halal meals failed to establish claim under Eighth Amendment to United States Constitution); *Abdul-Malik* vs. *Goord*, No. 96 Civ. 102 (DLC) (S.D.N.Y. Feb. 27, 1997) (Muslim inmate's rights not violated by prison's failure to provide halal meat three to five times a week

reasonable prison official could have concluded that Muslim inmates did not have an established right to halal meat (rather than pork-free or vegetarian meals), that he had broad discretion in the matter of prison dietary alternatives, and that his actions limiting menu options were lawful. Consequently, the defendants are entitled to the protections of qualified immunity.

*Conclusion.* As to each of the claimed infringements, the record reflects that the defendants attempted to accommodate the religious needs and requests of inmates practicing the Muslim faith, within bounds that they reasonably concluded were lawful and necessary to maintain the secure and efficient operation of the prison.

*Judgment affirmed.*

---

where "religious alternative menu" available); *Abdullah* v. *Fard,* 974 F. Supp. 1112, 1118-1119 (N.D. Ohio 1997) (no constitutional violation where Muslim inmate provided "nutritionally adequate alternatives" in lieu of halal meat); *Benjamin* v. *Coughlin,* 708 F. Supp. 570, 575-576 (S.D.N.Y. 1989) (no constitutional violation where prison refused to provide Rastafarian diet, even though Jewish and Muslim prisoners provided special meals).