Henry, Bruce R.,
J. Joseph “Gentle Moose” Blake, who is civilly committed to the Nemansket Correctional Center in Bridgewater, Massachusetts (Treatment Center), as a sexually dangerous person pursuant to G.L.c. 123A, practices the religion of Native Americans. Blake alleges that the defendants (all current or former Treatment Center officials) interfered with his right to practice his religion by (i) interfering with his regular access to Native American smudging and pipe ceremonies; (ii) denying him access to a purification lodge; (iii) denying him access to a drum, flute, rattle, and audiotapes for worship; (iv) failing to provide lima beans for religious celebrations; (v) denying him access to personal religious items, such as a headband, dream catcher, and pipe rug; (vi) failing to provide tobacco for worship; (vii) failing to provide a Native American volunteer to work with Blake and other members of his religious group; (viii) failing to open a special account for maintaining funds for Native American practices; and (ix) (by amendment) retaliating against him for filing suit.[1]
Blake seeks declaratory and injunctive relief and money damages for violations of Article 18, §§1, 4 of the Amendments to the Massachusetts Constitution;[2] the First and Fourteenth Amendments to the United States Constitution (pursuant to 42 U.S.C. §1983); retaliation under 42 U.S.C. §1983; G.L.c. 93, §102; the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §2000cc et seq.; Massachusetts Civil Rights Act, G.L.c. 12, §§11(H), 11(1); and G.L.c. 127, §88.[3] The complaints also seek certification of a class action.[4] Blake has filed a Renewed Motion for Appointment of Counsel.[5]
Before the court, after a hearing, is the Defendants’ Motion for Summary Judgment. For the reasons set forth below, that motion is ALLOWED in full.[6]
BACKGROUND
The facts taken in the light most favorable to Blake are as follows.
I. Procedural Background
On May 18, 1995, Blake pled guilty to a sexual offense and was sentenced to prison. Following service of his sentence, on November 26, 2002, Blake was temporarily committed to The Treatment Center. Thomas Aff. 1. He was housed in appropriate units while awaiting adjudication pursuant to G.L.c. 123A, §§12-14. Id. at 5-6. Blake filed this action on March 17, 2005. On April 5, 2005, Blake was adjudicated a sexually dangerous person (SDP), and was civilly committed to the Treatment Center for a period of one day to life. Id. Following adjudication, Blake was relocated to a different housing unit within the Treatment Center. Id. at 6.
At all relevant times the Treatment Center has housed three populations of adult male sex offenders: (i) those statutorily adjudicated as SDPs; (ii) inmates who are participating in the Department of Correction’s (DOC) voluntary sex offender treatment program (SPIs); and (iii) persons who have completed their criminal sentences and are awaiting adjudication with respect to their statutory status. Thomas Aff. at para. 2. Since December 2001 and in connection with a court order, SDPs and SPIs have been housed separately at all times. Id. It is uncontested that cell changes within units for those under civil commitment are routine, and occur for many reasons, including safety and medical concerns. Blake claims he was moved in retaliation for filing this action.
The court is aware that Blake has another lawsuit pending in the United States District Court for the District of Massachusetts (federal action). See Blake v. Murphy et al., 2009 WL 605820 (D.Mass.) (slip op. March 10, 2009) (Stearns, J.); see generally Blake v. Murphy etal, Case No. 1:05-cv-10508-RGS (D.Mass.). While the primary thrust of the federal action is the general conditions of SDP custody, there is some overlap with respect to religious freedom claims, and in particular the allegations with respect to a purification lodge (colloquially known as a sweat lodge). I have reviewed the docket and available pleadings in the federal action. As best I am able to discern at this time, no final ruling has occurred on this claim, and thus this court is free to address its view of both the federal and state claims. However, Blake cannot be permitted to abuse judicial resources by litigating the same claims in two places, and I accordingly shall tailor my rulings as necessary.
II. Religious Status
Blake is a member of the Native American Spiritual Awareness Council (NASAC). Thomas Aff. at paras. 1 -2.[7] NASAC meets for corporate worship once a week, from 2:30 p.m. to 5:30 p.m. Id. at para. 2. NASAC practices smudging; the burning of dried herbs known as kinnik-kinnik in an abalone shell; smoking kinnikkinnik in a ceremonial pipe; singing prayers; using a talking stick, drumming; and teaching. Id. Music is also available for use in the corporate worship ceremonies through a toy drum, a rattle, and four audio CDs. Id. A flute is on the approved list of religious items; however, it is disputed whether Defendant Thomas, Director of Treatment, ever received a request for a flute from NASAC. Compare id. at para. 4 (deny *337 ing NASAC requested flute for corporate worship), with Blake Aff. 4 (averring Blake requested flute on May 17, 2005 and October 24, 2005). NASAC members also have access to books on Native American spiritual practices in the Treatment Center library. Thomas Aff. at para. 4.
DOC has created a religious services handbook as a reference tool to assist administrators when evaluating inmate religious requests. Id. at para. 6. The handbook was first issued in April of 1999 and is periodically revised. It includes a section outlining commonly accepted practices for different faiths, including the Native American faith. The handbook also outlines approved property items for Native American practices and provides that inmates may purchase approved religious property items from approved vendors. A copy of the handbook is available in the Treatment Center library. Id.
During November and December 2004, NASAC was unable to meet in the Treatment Center chapel to conduct the smudge and pipe ceremonies because smoke from the ceremonies adversely affected some staff members and residents/inmates. Thomas Aff. at 3-4. A ventilation system was installed in the chapel area, but failed to resolve the smoke and odor issues. Id. The smudging and pipe ceremonies have since taken place outdoors. Blake Dep. at 29.
NASAC members also participate in two solstice and two equinox ceremonies each year. Thomas Aff. at para. 4. There is a ceremonial meal that includes the three sisters (corn, squash, and lima beans). Id. Lima beans were recently added to the meal per the request of NASAC. In October 2007, Blake stopped participating in the weekly NASAC corporate worship ceremonies because he believed the Treatment Center’s regulations hindered his right to properly practice his religion, causing the ceremonies to be disrespectful and a mockery. Blake Dep. at 35.
Blake possesses within his cell several religious items, including a red headband, a three-tier choker, a medicine bag, and a book called Native American Pathways that is used for personal prayer. Id. at 41 -44. He is permitted to pray on a daily basis in his cell. Id. at 44.
Prior to December 2004 the two NASACs (SDP and SPI) shared a ceremonial pipe. Blake Responses to Defs.’ First Set of Interrogatories 23. In December 2004, the SDP NASAC group was provided with its own ceremonial pipe. Id. Sometime in 2004, the stem of a pipe became clogged and could not be used. Blake Dep. At 51. Subsequently, a manmade stem was made to replace the clogged stem. Id. When Blake attended corporate worship, there were instances when the group would run out of kmnik-kinnik before a new supply arrived because the staff underestimated the amount necessary. Id. at 57. Between December 2004 and June 2005, there were seven occasions when NASAC was unable to conduct the pipe ceremony. Blake Responses to Defs.’ First Set of Interrogatories 23. Of those seven occasions, four were due to lack of kinnik-kinnik; two were due to the unavailability of staff to supervise the pipe ceremony; and one was due to the lack of a lighter. Id.
At the time of the parties’ summary judgment filings, there was no Native American volunteer providing services to NASAC at the Treatment Center, although Defendant Milhomme, Director of Volunteer Services, had recently located a Native American volunteer who agreed to provide certain services. Milhomme Aff. at para. 2. Blake also made efforts to locate a volunteer, but without success.
III. Purification Lodge
For six years, Blake requested that a purification lodge be constructed at the Treatment Center. Blake Aff. at para. 2. A purification lodge is made of sapling trees placed in a circle approximately twelve feet in diameter and secured into holes in the ground. First Murphy Aff. at para. I.[8] The saplings are bent and joined together to form a dome-shaped circle. Id. A pit is dug in the middle of the lodge to accommodate the heated rocks during the ceremony. Id. The frame of the purification lodge is covered with a non-porous material, such as blankets or tarps, to prevent the smoke and heat from escaping. Id.
The Treatment Center has determined over time that establishing a purification lodge presents significant security and safety concerns. Defendant Murphy, current Superintendent of the Treatment Center, averred that building a fire on the grounds of the Treatment Center could adversely affect the air quality of the facility because of the particular ventilation system on site. Id. Officials were concerned about the possibility that smoke from the wood fire used to heat the rocks would enter the facility and create a health hazard. Id. This problem had already occurred at the Souza-Baranowski Correctional Center (SBCC) in Shirley, Massachusetts, when attempts to establish a purification lodge were made there. Id.[9] SBCC has a ventilation system similar to the one at the Treatment Center. Id.
Due in part to orders issued in the federal action, test fires were conducted at the Treatment Center on January 30, 2009 and February 25, 2009. Second Murphy Aff. at para. 2. Defendant Murphy averred that these test fires resulted in complaints from staff and residents/inmates concerning the smoke in the ventilation system. Id. Officials were concerned in particular for staff or residents/inmates who suffer from asthma or other respiratory problems. Id. Officials further determined that the Treatment Center’s perimeter was not large enough to securely establish a purification lodge. Id. at paras. 3-4. Experience at other facilities within the DOC system establishes that a lodge must be adequately distanced from the main yard of the facility, to protect the purification lodge from inmate vandalism, and to provide sufficient se *338 curity to prevent escape. Id. Finally, because SDPs and SPIs must be separated at all times, the Treatment Center would have to conduct two separate purification ceremonies, on different days, further increasing safety and security concerns. Id.
Blake contests the validity of the results from the test fires, as well as the officials’ conclusions on other impediments. Blake argues that the test fires were not properly representative of the fires from a purification ceremony because: the test fires were much larger than ceremonial fires; there was no pit dug for the fires; unclean burning scrap wood was used; and the test fires were conducted on snow-covered ground, which contributed to an unexpected and abnormal amount of smoke. Blake Aff. at paras. 2-3; Stevens Aff. at paras. 1-3. Blake points out that no NASAC member or other experienced person was involved in the test fires, and claims escape risk concerns could be eliminated if the Treatment Center built a third perimeter fence or assigned a corrections officer to oversee the monthly ceremony. Blake Aff. at para. 3.
SUMMARY JUDGMENT STANDARD
Summary judgment is properly granted when there is no genuine issue as to any material fact, and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Carey v. New England Organ Bank, 446 Mass. 270, 278 (2006). A fact is material if it would affect the outcome of the case. A dispute of fact is genuine if the evidence would permit a reasonable fact finder to return a judgment for the non-moving party. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). Because Blake has the burden of proof at trial, the defendants may prevail on their motion by demonstrating, through reference to materials properly in the summary judgment record and unmet by countervailing evidence, that Blake has no reasonable expectation of proving an essential element of his case. Carey, 446 Mass. at 278, citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The defendants may also meet their burden by offering affirmative evidence that negates an essential element of Blake’s case. Flesner, 410 Mass. at 809. The court views the facts in the light most favorable to Blake, Jupin v. Kask, 447 Mass. 141, 143 (2006), but Blake must set forth specific admissible facts demonstrating there is a genuine issue for trial. Mass.R.Civ.P. 56(e); Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 644 (2002). The court views the evidence in the light most favorable to Blake, but does not weigh evidence, assess credibility, or find disputed facts. Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982).
DISCUSSION
I. Massachusetts Constitutional Claim
Blake claims the defendants violated his right to the free exercise of religion. Article 46, §1 of the Amendments to the Massachusetts Constitution provides that “no law shall be passed prohibiting the free exercise of religion.”[10] Article 46, §4 affirms that inmates of publicly controlled penal institutions are not to be deprived of the “opportunity of religious exercises therein of [their] own faith.”[11]
A. Standard of Review
Blake properly notes that he is a civil detainee, not serving a criminal sentence, and thus not a prisoner. Therefore, he argues, “prisoner” law, which recognizes a prison’s safety and security as a compelling state interest in both constitutional and statutory analysis, is inapplicable to his claims. For example, with respect to his free exercise argument, Blake contends that the more lenient standard for assessing government conduct enunciated in Turner v. Safley, 482 U.S. 78 (1987), which is rooted in penological interests, is inapposite because penological interests deal with the punishment and rehabilitation of criminals.[12] Blake maintains that these considerations have no application to civil detainees such as himself, and thus he is entitled to a strict scrutiny standard of review which would apply to a free citizen. I acknowledge, as has our Supreme Judicial Court, that these distinctions are important to developing the proper standards of treatment for statutory detainees. I am not persuaded, however, that Blake may — or should — be treated as a free citizen for purposes of his religious exercise.
Blake is most obviously not a free citizen; he has been civilly committed to the Treatment Center as an SDP because he has been adjudicated to be a danger to public safety. G.L.c. 123, §6A (“Any person committed as a sexually dangerous person to the treatment center or a branch thereof under the provisions of this chapter shall be held in the most appropriate level of security required to ensure protection of the public, correctional staff, himself and others”). The statute seeks to balance the dual concerns of protecting the public “from harm by persons likely to be sexually dangerous” with the respondent’s substantive due process rights. Commonwealth v. Parra, 445 Mass. 262, 264 (2005). As the Supreme Judicial Court stated in Commonwealth v. Major, 354 Mass. 666, 668 (1968), “[t]he justification for removing sexually dangerous persons from society . . . and subjecting them to corrective treatment lies in assuring the safety of the general public as well as the safety and welfare of the dangerous person.” Placement at the Treatment Center was intended, at least in part, to protect society, Langton v. Johnston, 928 F.2d 1206, 1216 (1st Cir. 1991), while exploring whether rehabilitation is possible.
The record reflects that the Treatment Center is unique among DOC facilities, in that it houses both SDPs and SPIs. It therefore functions as a prison as well as a place of treatment, and holds multiple security and safety interest in its residents, its inmates, and its staff. For this reason, and because Blake himself relies in bringing his claim on a constitutional provision protecting prison inmates, I rule that prison *339 jurisprudence and penological interests are quite relevant to Blake’s claims, even if not automatically controlling. For purposes of clarity, I review both the allegedly stricter and intermediate standards before analyzing Blake’s claims.
Blake urges the court to apply what he considers to be a strict standard of review to DOC’s actions, as articulated in Hobbie v. Unemployment Appeals Comm’n of Florida, 480 U.S. 136 (1987) (restriction on unemployment benefits). “Where the state . . . denies [an important] benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.” Id. at 141 (emphasis omitted), quoting Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 717-18 (1981). These infringements “could be justified only by proof by the State of a compelling interest.” Id. (citations omitted). To prevail under this standard, Blake would first need to show that the defendants denied him an important benefit, which had the effect of imposing substantial pressure on him to violate his religious beliefs. If Blake could make this showing, the burden would then shift to the defendants to demonstrate that a compelling state interest justified the restriction.
The Supreme Judicial Court has, in contrast, articulated a two-stage analysis for the review of prison regulations and policies that burden the rights of inmates to freely practice their religious beliefs as guaranteed by the Massachusetts Constitution. Rasheed v. Comm’r of Correction, 446 Mass. 463, 467 (2006), citing Attorney Gen. v. Desilets, 418 Mass. 316, 321-23 (1994). First, the prisoner must demonstrate that the challenged policy or regulation substantially burdens the free exercise of a sincerely held religious belief. Desilets, 418 Mass. at 321-23. Second, the burden shifts to the Department of Correction to demonstrate that (1) it has an interest sufficiently compelling to justify that burden, and (2) the granting of an exemption to persons in the inmate’s position would unduly burden that interest. Id. “Under [the Desilets] standard, such regulations and policies must advance compelling State interests and be tailored narrowly in pursuit of those interests.” Ahmad v. Department of Corr., 446 Mass. 479, 485 (2006), citing Rasheed at 465.[13]
Thus, to prevail on his Article 46 claim under the “prisoner” standard, Blake would first need to show that his right to freely exercise his religious beliefs has been burdened. “Only if a burden is established must the analysis move to the next step: a consideration of the nature of the burden, the significance of the governmental interest at stake, and the degree to which that interest would be impaired by an accommodation of the religious practice.” Rasheed, 446 Mass. at 472, citing Curtis v. School Comm. of Falmouth, 420 Mass. 749, 760 (1995).
The degree of the burden necessary to trigger a further analysis of the department’s justification for the regulations must be “substantial.” Id. “A ‘substantial burden’ is one that is coercive or compulsory in nature.” Curtis, 420 Mass. at 761, citing Lyng v. Northeast Indian Cemetery Protective Ass’n, 485 U.S. 439, 447-51 (1988). “Incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs [do not] require government to bring forward a compelling justification for its otherwise lawful actions.” Id. at 762 (emphasis added), quoting Lyng, 485 U.S. at 450-51.
For the reasons explained below, Blake’s claims fail under either standard.
B. Analysis of Blake’s Claims
1. Interrupted Access to Smudging and Pipe Ceremonies
Blake alleges that between December 20, 2004 and June 17, 2005 there were seven occasions in which the NASAC group was not able to conduct the pipe ceremony. It is undisputed, however, that four of those occasions were due to a lack of an adequate supply of kinnik-kinnik; two were due to the unavailability of staff to supervise the pipe ceremony; and one was due to the lack of a lighter to light the pipe. Blake acknowledges that these occasions were infrequent. See Blake’s Response to Defs.’ First Set of Interrogatories 23-24 (noting that pipe was available 87% of the time). Blake also challenges NASAC’s inability to conduct the smudging and pipe ceremonies in the chapel, and its restriction to conducting the ceremonies outdoors instead. In all of these instances I conclude that Blake has failed to demonstrate any reasonable expectation of proving that his right to freely exercise his religious beliefs has been substantially burdened as a matter of law. Rasheed, 446 Mass. at 472-75.
2. Access to Tobacco for Smudging and Pipe Ceremonies
Blake further alleges that the defendants’ failure to provide him with access to tobacco for the smudging and pipe ceremonies violates his free exercise of religion. However, state statute and DOC policies prohibit the use of tobacco products by inmates or staff in or on the grounds of any DOC facility. 103 Code Mass. Regs. §203.00 et seq.; 103 Code Mass. Regs. §444.00 et seq. General Laws c. 270, §22 defines “smoking” as “lighting of a cigar, cigarette, pipe or other tobacco product or possessing a lighted cigar, cigarette, pipe or other tobacco or non-tobacco product designed to be combusted and inhaled.” Section 22 further defines a “public building” as “a building owned by the commonwealth or any political subdivision thereof, or in an enclosed indoor space occupied by a state agency or department of the commonwealth which is located in a building not owned by the commonwealth.” Id. Accordingly, no inmate or person in DOC custody is *340 permitted to possess or use any tobacco products. 103 Code Mass. Regs. §444.01. Even if Blake could demonstrate that Defendants’ ban on tobacco products deprived him of an important benefit, there is no material dispute that a compelling state interest exists for the ban. Rasheed, 446 Mass. at 475.
3. Lack of Native American Volunteer
Blake also contends that the lack of a Native American volunteer from the community has substantially burdened his religious practices. Although efforts to locate a volunteer were initially unsuccessful, the Defendant Milhomme had located someone who agreed to come to the Treatment Center on a monthly basis at the time these pleadings were filed. Milhomme Aff. 2-3. Milhomme’s efforts are in compliance with the applicable DOC regulations on Inmate Religious Programs and Services, which simply require DOC to make reasonable efforts to locate volunteers from the community to assist with inmate religious programs. 103 Code Mass. Regs. §471.09. Particularly given the undisputed fact that Blake himself had difficulty locating such a person, I rule that Blake has failed to demonstrate that the initial failure of the Treatment Center to locate a Native American volunteer coerced him to violate his religious beliefs.
4. Lack of Access to Religious Items
The complaints allege a denial of Blake’s rights because he has not been provided with a flute for corporate worship, a dream catcher, and a pipe rug.[14] However, Blake has not demonstrated by way of detailed facts how the lack of these items has coerced him to violate his religious beliefs. Under DOC regulations, strict limits are placed on the type and amount of personal property inmates may keep within their cells. 103 Code Mass. Regs. §403.10. These restrictions are necessary to facilitate quicker and more thorough cell searches, reduce fire hazards, reduce areas where inmates can hide contraband, and reduce housekeeping hazards.
Blake has access to Native American religious practices including: (i) weekly corporate worship that includes smudge and pipe ceremonies; (ii) daily prayers in his cell; (iii) the use of a talking stick, a drum, rattle, and audio CDs for use in ceremonies; (iv) access to two equinox and two solstice ceremonies that take place annually at the Treatment Center that include special meals; and (v) several Native American items including a red headband, a three-tier choker, medicine bag, and a book called Native American Pathways used for personal prayer. At most, the Treatment Center’s policies may have the incidental effect of making it more difficult for Blake to practice his religion, but the policies and regulations do not coerce Blake to violate his religious beliefs. As a result, this court need not move to the next step of the analysis — the significance of the governmental interest at stake with respect to this claim. Rasheed, 446 Mass. at 474-77.[15]
5.Purification Lodge
The most substantial of Blake’s claims is the lack of a purification lodge. The court accepts, for the purposes of ruling on this Motion only, that the purification lodge is a “cornerstone” of Blake’s religious observance, and that there is no adequate substitute or surrogate practice, such that the Treatment Center’s denial of this request substantially interferes with Blake’s religious observance and practice. Blake Aff. at paras. 7 and 8.1 nonetheless rule that this claim must fail, because the undisputed record reveals compelling safety and security interests to support Defendants’ position.
It cannot be doubted that the Treatment Center officials have a strong interest in ensuring the order, safety, and security of their institution. Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005) (compelling interest standard to be applied with due deference to need to maintain order, security, and discipline in prison). However, Defendants here do not “merely brandish the words ‘security’ and ‘safety’ and expect that their actions will automatically be insulated from scrutiny.” Farrow v. Stanley, No. 02-567-PB, 2005 U.S.Dist. LEXIS 24374, at *28 (D.N.H. Oct. 20, 2005), quoting Campos v. Coughlin, 854 F.Sup. 194, 207 (S.D.N.Y. 1994), citing Werner v. McCotter, 49 F.3d 1476, 1480 (9th Cir. 1995). Instead they have both articulated specific concerns — with respect to ventilation, adequate building space on this particular site, sufficient security barriers in place, and access to a water supply — and documented their investment of time to pursue investigation of these concerns for construction of the requested lodge.
As a result this record reflects that Defendants have undertaken a serious examination of this issue. The Superintendent of the Treatment Center in his first affidavit outlined his concerns that establishing a purification lodge on this site would pose significant safety and security issues, including air quality and ventilation; lack of insufficient perimeter space to protect the purification lodge from vandalism by inmates; and the inability to provide sufficient security to prevent possible escape. He then proceeded to conduct tests in an effort to simulate the proposed environment of the lodge on the site, and reported the results of those tests in his second affidavit.
Defendants are warranted in their concern that providing ready access to fire, hot rocks, and an enclosed area inaccessible to outside view would compromise the safety and security of the Treatment Center. See Fowler v. Crawford, 534 F.3d 931, 939 (8th Cir. 2008) (DOC prohibition on sweat lodge was in furtherance of compelling government interest); see also Ventura v. Felts, 2008 WL 5412264 at *4 (N.D.Tex. 2008) (denying prisoner request for sweat lodge based on legitimate penological interests in maintaining security and safety). I also rule it significant that because SDPs and SPIs must be kept separate, the Treatment *341 Center would need to conduct two separate ceremonies per month, which would legitimately increase the Treatment Center’s safety and security concerns.
Blake’s suggestions for less restrictive alternatives to the prohibition of a purification lodge at the Treatment Center are unrealistic, and Defendants have no constitutional duty to pursue them. By way of two examples only, transporting Blake to another DOC facility that conducts purification lodge ceremonies is not feasible because Blake, as an individual under civil commitment to the Treatment Center, cannot be held in a prison, even temporarily. See Second Murphy Aff. at para. 4. And it is not for Blake to decide that one correctional officer assigned to oversee the lodge during the ceremony would provide either adequate security or appropriate use of manpower.
Similarly, Blake’s challenges to the DOC’s proffer are unpersuasive. Blake claims that the Treatment Center’s test fires were invalid because they did not accurately replicate a purification lodge ceremony; no NASAC member or person familiar with the ceremonial fire was present during the testing, leading to unexpected amounts of smoke; and the escape risk concern could be eliminated if the Treatment Center built a third perimeter fence or had a guard watch over the monthly ceremony. The court does not find these arguments persuasive such that they sufficiently counter the Treatment Center’s demonstrated security and safety concerns.
I therefore rule that the record before me may warrant a reasonable factfinder in reaching only one conclusion: that the denial of a purification lodge is based on the compelling interests of institutional order, safety, and security. Defendants have adduced ample evidence demonstrating that a purification lodge would compromise these compelling state interests in the unique context of this particular institution. In the highly dangerous and volatile environment in which the Treatment Center’s goals of security and integrity must be met, the court concludes that the Treatment Center has adequately demonstrated that exceptions sought by Blake would unduly hinder their fulfillment.
II.First Amendment Claim
My ruling that Blake’s claim fails under the Massachusetts Constitution, which affords more protection to the free exercise of religion than that afforded by the United States Constitution, would suggest Blake’s First Amendment claim may fail under the more lenient Turner standard. Ahmad, 446 Mass. at 485. However, Blake has a First Amendment claim pending in the federal court action on these same facts. As a result, I decline to reach this issue and dismiss Blake’s First Amendment claim here, because it is redundant and an abuse of judicial resources to permit a litigant to proceed on the same issue in two forums. I rule that due regard for federalism requires me to defer to the federal court on this federal issue.
III.RLUIPA Claim
RLUIPA provides:
No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . .. even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.
42 U.S.C. §2000cc-l(a).
I do not see that Blake has brought a RLUIPA claim in the federal action.
Given my determination that the Treatment Center’s policies and actions toward Blake do not violate the Massachusetts Constitution, it follows that the challenged policies also satisfy RLUIPA. Ahmad, 446 Mass. at 485-86 (if challenged “regulations and policies . . . are permissible under the Massachusetts Constitution, they will meet the requirements of RLUIPA”). Therefore, the defendants are entitled to summary judgment on the RLUIPA claim.[16]
IV.Claim of Retaliation Under 42 U.S.C. §1983
Blake asserts that the defendants retaliated against him for filing a complaint. Specifically, he alleges that he was (i) transferred to a “noisier” housing unit; (ii) discharged from his temporary work assignment; and (iii) transported on one occasion to Old Colony Correctional Center, approximately one hundred yards away from the Treatment Center, in a windowless van with wooden benches and no seatbelts. To state a claim for retaliation, a plaintiff must show that he would not have received the sanctions but for retaliatory motives. See McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979). A prison inmate must be able to show that the forbidden purpose was the exclusive cause of the disciplinary action. Jackson v. Fair, 846 F.2d 811, 820 (1st Cir. 1988); Puleio v. Commissioner of Correction, 52 Mass.App.Ct. 302, 310 (2001). I am aware of no authority suggesting we should not apply this same standard to a civil detainee.
First, Blake has failed to present specific facts tending to show that the defendants’ alleged acts were retaliatory in nature. Second, he has failed to show that “but for” filing this complaint, he would not have been transferred to another unit, lost his temporary job, or been transferred in a windowless van without seatbelts on one occasion. The record reveals legitimate reasons for the challenged actions. For example, Blake’s challenged transfer from a C-l (unit for civilly committed individuals) to a D-2 housing unit (unit for temporaiy committed individuals) took place on March 2, 2005, before he filed the instant action on March 17, 2005. On April 5, 2005, he was civilly adjudicated sexually dangerous, and was then committed to the Treatment Center and accordingly was appropriately moved back to the C-l unit where he now resides on April 25, 2005. Blake Depo. at 13-14, *342 60-67. With repect to the other two challenged actions, Blake failed to produce any specific evidence to support his argument that they were retaliatory in any way. Proximity in time in and of itself is insufficient as a matter of federal law.
V.Equal Protection Claim Under Fourteenth Amendment and G.L.c. 93, §102
The complaints allege a violation of equal protection under the Fourteenth Amendment, because the defendants have allegedly denied Blake and other NASAC members the ability to engage in special celebrations such as the solstice and equinox ceremonies, while permitting celebrations of other faiths at the Treatment Center.[17] Blake, however, testified in his deposition that the Treatment Center does allow NASAC members to participate in these ceremonies and has even added lima beans, per NASAC’s request, to the menu during these celebrations. See Blake Dep. 45-46. The complaints also allege a violation of equal protection because the defendants (i) maintain an “approved roster” of Native Americans, whereas the defendants have not placed any racial or ethnic requirements on membership in other religious groups, and (ii) Blake and other NASAC members have been denied equal treatment in connection with access to adequate time and space for religious worship and study. More specifically, Blake asserts NASAC should be afforded daily time, space, and material necessary to perform the pipe and smudge ceremonies as well as the weekly purification lodge ceremonies.
The Fourteenth Amendment requires that all persons similarly situated shall be treated alike, but it does not demand “that every religious sect or group within a prison — however few in numbers — must have identical facilities or personnel.” Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972) (per curiam); see also Plyler v. Doe, 457 U.S. 202, 216 (1982) (Equal Protection Clause “does not require [people who] are different in fact or opinion to be treated in law as though they were the same”). To prove a violation of the equal protection clause, a plaintiff must show that the defendant acted with discriminatory intent. Washington v. Davis, 426 U.S. 229, 239-42 (1976).
Here, even if Blake’s allegations are true, he has failed to put forth evidence to suggest that any restrictions on his pursuit of his faith occurred as a result of intentional discrimination by any of the named defendants. Blake’s equal protection claim, therefore, fails as a matter of law. For the same reasons, Blake’s G.L.c. 93, §102 claim also fails.[18] Defendants are entitled to summary judgment on these claims.
VI.Claim Under Massachusetts Civil Rights Act (MCRA), G.L.c. 12, §§ 11(H), 11(1)
To establish a claim under the MCRA, a plaintiff must prove interference, or attempted interference, with the exercise or enjoyment of rights secured by the Constitution or laws of the United States or laws of Massachusetts through threats, intimidation or coercion. Swanset Dev. Corp. v. Taunton, 423 Mass. 390, 395 (1996). Threats are “acts or language by which another is placed in fear of injury or damage.” Delaney v. Chief of Police of Wareham, 27 Mass.App.Ct. 398, 409 (1989). Intimidation has been defined as “creation of fear to compel conduct,” and coercion consists of “the active domination of another’s will.” Id.
Here, the complaints allege that the “defendants [sic] interference with Blake’s and other NASAC members [sic] religious faith and rightful attempts to practice that faith have been coercive, threatening and intimidating and done with acting under the color of law” and the “defendants and/or their agents have repeatedly subjected Blake and other NASAC members to verbal abuse because of their religious beliefs.”[19] Aside from these conclusory allegations, the complaints fail to allege any specific facts to support a violation of the MCRA. The record is devoid of any facts demonstrating any cognizable threats, intimidation, or coercion applied in connection with the challenged policies. Because Blake has failed to offer any evidence demonstrating threats, intimidation or coercion, there cannot be a violation of the MCRA. Defendants are entitled to summary judgment on this claim.
VII.Claim Pursuant to General Laws c. 127, §88
General Laws c. 127, §88 provides that an inmate “shall not be denied the free exercise of his religious belief and the liberty of worshipping God according to the dictates of his conscience in the place where he is confined.”[20] Ahmad, 446 Mass. at 481. The statute further provides, however, that it “shall not be so construed as to impair the discipline of any such institution so far as may be needed for the good government and the safe custody of its inmates.” Id. citing G.L.c. 127, §88.
In order for the guarantee of religious freedom, constrained by the reasonable and necessary requirements of security, to be properly implemented, the Legislature provided the commissioner, his deputies, and superintendents with the authority to establish policies, rules and regulations regarding inmate religious programs. See G.L.c. 124, § 1 (q); G.L.c. 124, §2; G.L.c. 125, §14. Pursuant to his authority, the commissioner promulgated 103 Code Mass. Regs. §403.10(9), establishing departmental guidelines with respect to religious articles, and 103 Code Mass. Regs. §§471.00 (1998), establishing religious programs and services. In addition, consistent with his broad statutory authority, the commissioner prepared and established the handbook to serve as a tool and reference source for prison administrators and inmates. The handbook provides a process by which inmates can make specific requests through a religious services review committee [ ], consisting of several senior correction officials who review the requests for potential security concerns and make recommendations to the commissioner for a final determination.
Rasheed, 446 Mass. at 476.
An agency’s interpretation of its own regulations is due considerable deference unless arbitraiy, unreason *343 able, or inconsistent with the plain terms of the regulations themselves. Warcewicz v. Department of Envtl. Protection, 410 Mass. 548, 550 (1991). “So long as the agency’s interpretation of its regulations and statutory mandate is rational, and adhered to consistently, it should be respected.” Boston Police Superior Officers Fed’n v. Boston, 414 Mass. 458, 462 (1993). Here, Blake has failed to demonstrate how the Treatment Center’s regulations are arbitrary, unreasonable, or inconsistent. Because this court has concluded above that the regulations carry out the Treatment Center’s reasonable interests of security and safely, the defendants are entitled to summary judgment on Blake’s claim for violation of G.L.c. 127, §88.
VIII. Qualified Immunity
Blake has sued all of the Defendants in both their official and individual capacities, except for Michael Thomas, who is sued only his individual capacity.[21]
The doctrine of qualified immunity shields from liability government officials who perform discretionary tasks, Duarte v. Healy, 405 Mass. 43, 47 (1989), “insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Shedlock v. Department of Correction, 442 Mass. 844, 859 (2004), quoting Barlow v. Fitzgerald, 457 U.S. 800, 818 (1982). For a right to be clearly established, the unlawfulness of the defendants’ conduct must be “apparent” based on then-existing law. Anderson v. Creighton, 483 U.S. 635, 640 (1987). To determine whether a reasonable official would have known that his conduct violated a clearly established right, the court makes an objective inquiry into the legal reasonableness of the official action. That determination is a question of law. Clancy v. McCabe, 441 Mass. 311, 323 (2004). It is recognized that the qualified immunity standard gives “ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.” Hudson v. Maloney, 326 F.Sup.2d 206, 210 (D.Mass. 2004) (internal quotations and citations omitted).
On a motion for summary judgment, the relevant inquiry is “whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information that the official possessed at the time of his allegedly unlawful conduct.” Clancy, 441 Mass. at 317, quoting Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91 (1st Cir. 1994).
Here, the precise question presented is whether, during the relevant time, the law had clearly established that a civilly committed individual who practices the Native American religion has the right to uninterrupted smudging/pipe ceremonies; access to a purification lodge; access to a drum, flute, rattle, and audiotapes for worship; access to personal religious items (e.g., a headband, dream catcher, and pipe rug); and access to a Native American volunteer to work with NASAC. I rule in this context that reasonable officials at the Treatment Center could well have concluded that they had broad discretion over the institution’s order, safety, and security, and that their actions denying Blake’s requests and limiting his access to religious items were lawful. Thus, even had any of Blake’s state claims survived summary judgment on the merits, Defendants would be entitled to the protection of qualified immunity.[22]
ORDER
For the foregoing reasons, it is hereby ORDERED that the Defendants’ Motion for Summary Judgment is ALLOWED. It is further ORDERED that Blake’s Motion to Strike and his Renewed Motion for Appointment of Counsel are DENIED. Final judgment shall enter for the defendants dismissing the plaintiffs complaint.
*344 An inmate of any prison or other place of confinement shall not be denied the free exercise of his religious belief and the liberty of worshipping God according to the dictates of his conscience in the place where he is confined; and he shall not be required to attend any service or religious instruction other than that of his own religious belief, if religious services and instructions of his own belief are regularly held at the institution; and he may, in illness, upon request to the superintendent, keeper, receive the visits of any clergyman whom he may wish. The officers having the management and direction of such institutions shall make necessary regulations to carry out the intent of this section. This section shall not be so construed as to impair the discipline of any such institution so far as may be needful for the good government and the safe custody of its inmates, nor prevent the assembling of all the inmates, who do not attend a regularly held religious service of their own belief, in the chapel thereof for such general religious instruction, including the reading of the Bible, as the officer having charge of the institution considers expedient.

 Blake has filed an Amended Complaint (Paper #13) and two Supplemental Complaints (Papers #22.1 and 39). I have reviewed them all, and this Memorandum and Order applies to all pleaded claims, whether or not specifically referenced.

In 1917,art. 18 of the Amendments to the Massachusetts Constitution was superseded by art. 46. See Mass. Cons. Art. 18, Historical Notes. Accordingly, the court will refer to this claim as one asserted under art. 46.

Blake also asserts claims pursuant to G.L.c. 266, §127B, G.L.c. 124, §l(e), and Article 16 of the Massachusetts Declaration of Rights. Defendants have not briefed these claims. General Laws c. 266, §§127A and 127B provide criminal and civil remedies for destroying or defacing a building of worship or other religious site, or causing injuries to people or buildings thereby. General Laws c. 124, §l(e) provides that the commissioner of correction establish, maintain, and administer programs of rehabilitation of persons committed to the custody of the department. Article 16 of the Declaration of Rights provides: “The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth. The right of free speech shall not be abridged.” Blake does not afiege specific facts against the defendants with respect to any of these particulars, and I rule Defendants are entitled to judgment on these claims.

Granting or denying class certification under Rule 23 is discretionary with the trial judge. Weld v. Glaxo Wellcome, Inc., 434 Mass. 81, 84-85 (2001). In deciding whether to grant a motion for certification, the court considers whether the plaintiff has reasonably met the prerequisites of Rule 23, rather than focusing on the substantive merits of his claims. Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 606 (1985). Nothing in any version of the complaint suggests Blake could meet this burden.

Blake cites no Massachusetts state authority in support of his argument that he is entitled to counsel in this action, and the court therefore denies this motion.

Blake moves to strike the portions of Defendant Murphy’s second affidavit that reference complaints from staff or inmates regarding test fires, contending those averments are inadmissible hearsay. Mass.R.Civ.P. 56(3). The court finds Blake’s own factual submissions to include inadmissible speculation, lay opinion, conclusory allegations, and improbable inferences of the sort insufficient to defeat summary judgment. The court considers and relies in this decision on only those portions of the parties’ pleadings as would be admissible at trial.

At the Treatment Center, SDPs and SPIs belong to separate NASACs. Thomas Affidavit at para 3. Where this memorandum uses the term “NASAC,” it refers to the SDP NASAC.

Defendant Murphy’s first Affidavit dated December 22, 2008 attested to his safely and security concerns for the institution, but was submitted prior to the test fires taking place. His Second Affidavit is dated Februaiy 25, 2009, and describes the institution’s experience with the test fires.

The record reflects reference to four to five DOC facilities have previously built purification lodges in place.

This language is similar to language in the First Amendment to the United States Constitution.

The full text of art. 46, §4 provides: “Nothing herein contained shall be construed to deprive any inmate of a publicly controlled reformatory, penal or charitable institution of the opportunity of religious exercises therein of his-own faith; but no inmate of such institution shall be compelled to attend religious services or receive religious instruction against his will, or, if a minor, without the consent of his parent or guardian.”

According to Black’s Law Dictionary, “penology” is “the study of penal institutions, crime preventions, and the punishment and rehabilitation of criminals, including the art of fitting the right treatment to an offender.” Black’s Dictionary 522 (8th ed. 2004).

“This is a stricter standard of scrutiny than the United States Supreme Court adopted in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed. 64 (1987), for the review of prison regulations that infringe on rights guaranteed by the United Sates Constitution. Such regulations are judged under a "reasonableness" test, less restrictive than ordinarily applied to the infringement of fundamental rights." Ahmad, 446 Mass. at 485. Under the Turner standard, “when a prison regulation impinges on inmates’ constitutional rights, the regulation is valid so long as it is "reasonably related to legitimate peno-logical interests." Turner, 482 U.S. at 89-91.

In fact, Blake testified in his deposition that a pipe rug is used to store a ceremonial pipe. However, the NASAC groups are provided with a pipe bag for the storage of the ceremonial pipe instead of a pipe rug. See Blake Dep. at 79-80. Blake testified that a pipe rug would provide better protection for the ceremonial pipe, but acknowledged that since the ceremonial pipe and pipe bag is now stored in a wooden cabinet instead of a metal cabinet, there has been less of a problem with damage to the ceremonial pipe.

defendants did not address Blake’s claim regarding the Treatment Center’s failure to open a special account for maintaining funds for Native American practices. I nonetheless rule this claim fails under the operative standard.

As the First Circuit explained in Spratt v. Rhode Island Dep’t of Correction, “[a] claim under RLUIPA includes four elements. On the first two elements, (1) that an institutionalized person’s religious exercise has been burdened and (2) that the burden is substantial, the plaintiff bears the burden of proof.” 482 F.3d 33, 38 (1st Cir 2007). “Once a plaintiff has established that his religious exercise has been substantially burdened, the onus shifts to the government to show (3) that the burden furthers a compelling governmental interest and (4) that the burden is the least restrictive means of achieving that compelling interest.” Id. “The statute does not define ‘substantial burden.’ ” Hudson v. Dennehy, 538 F.Sup.2d 400, 409 (D.Mass. 2008). “However, Supreme Court precedent identifies the existence of such a burden when government puts ‘substantial pressure on an adherent to modify his behavior and to violate his beliefs ...’ ” Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 718 (1981); see Spratt, 482 F.3d at 38 (assuming arguendo, that the Thomas standard is generally applicable). RLUIPA should be applied with particular sensitivity when security concerns are legitimately at issue. Hudson, 538 F.Sup.2d at 409. A prison’s interest in order and security is always compelling. See, e.g., Cutter, 544 U.S. at 725 n.13 (2005). “[D]eference is due to institutional officials’ expertise in this area.” Spratt, 482 F.3d at 39, quoting Cutter, 544 U.S. at 725 n. 13. “While it is beyond cavil that maintaining prison security is a compelling State interest deserving of scrupulous deference by the courts, ‘merely stating [that there is] a compelling interest does not fully satisfy [the government’s] burden on this element of RLUIPA.’ ” Spratt, 482 F.3d at 39. Rather, prison authorities must provide some basis for their concern and the policy at issue must be narrowly tailored to further this interest by the least restrictive means possible. Id. “While RLUIPA holds the government to a higher standard than that required in [Turner v. Safley] with respect to the free exercise of religion clause of the First Amendment, [the RLUIPA] standard is consistent with the stricter standard adopted in Rasheed.” Id.

Defendants’ Memorandum does not address this claim.

General Laws c. 93, § 102(a), one of the provisions of the Massachusetts Equal Rights Act (MERA), provides: “All persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have, except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts, to inherit, purchase, to lease, sell, hold and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of eveiy kind, and to no other.” The Appeals Court has clarified this standard: “Only discrimination that is both purposeful and based on sex, race, color, creed or national origin comes within the reach of the statute; if any element is missing, a claim under the statute fails.” LaCava v. Lucander, 58 Mass.App.Ct. 527, 535-36 (2003).

See Complaint paras. 58 and 69.

General Laws c. 127, §88 incorporates and expands upon Section 4 of art. 46. The full text of G.L.c. 127, §88 is:

An official-capacity suit against a state officer is not a suit against the official, but rather a suit against the official’s office. A state official acting within his or her office is not a “person” under the statute and therefore may not be held liable for damages. Will v. Michigan Dep’t of State Police, 491 U.S. 58, 71 (1989).

There are other defenses available to Defendants which need not be addressed at this time. Individual officials can only be held liable for their own actions, Guzman v. City of Cranston, 812 F.2d 24, 26 (1st Cir. 1987), and there must be an affirmative link between that action and the claimed harm. Camilo-Robles v. Zapata, 175 F.3d 41, 43-44 (1999).